Argued and submitted November 1, reversed and remanded December 21, 1982

In the Matter of the Compensation of
Orville A. Bales, Claimant.

BALES,

*Respondent on Review,*

*v.*

STATE ACCIDENT INSURANCE FUND
CORPORATION,

*Petitioner on Review.*

(NO. 80-03397, CA A23327, SC 28780)

656 P2d 300

Darrell E. Bewley, State Accident Insurance Fund, argued the cause and filed briefs for petitioner on review.

Benton Flaxel, North Bend, argued the cause and filed the petition for respondent on review. With him on the brief in the Court of Appeals was Flaxel, Todd & Nylander, North Bend.

LENT, C. J.

**LENT, C. J.**

The issue is whether the opinion evidence of an expert that a claimant's heart attack was not caused by his job activity should be given "less weight," as a matter of law, because the expert belongs to a school of medical thought that holds that stress does not cause heart attacks. In this case, the Court of Appeals, *Bales v. SAIF,* 57 Or App 621, 626, 646 P2d 83 (1982), held that the opinion should be given less weight, relying upon what this court said in *Clayton v. Compensation Department,* 253 Or 397, 454 P2d 628 (1969). We quote from the Court of Appeals decision:

> "The Supreme Court has rejected the school of thought to which the Eugene specialist subscribes. In *Clayton v. Compensation Department,* 253 Or 397, 454 P2d 628 (1969), the court reversed the granting of a judgment notwithstanding the verdict of compensability found by the jury, stating in relevant part:
>
>> " 'The question of the sufficiency of the evidence to warrant submission of a case to the jury is difficult enough in any area of the law. In the heart attack cases the difficulties are multiplied because the medical authorities themselves are not agreed upon the basic question of whether stress of any kind can be a precipitating factor in causing a heart attack. We are not certain which of these conflicting theses is right but since we must proceed upon the basis of a uniform rule a choice must be made. We have chosen to reject the view that exertion or stress can never be a causative factor in these cases.' 253 Or at 402.
>
> "Here, the Eugene specialist's opinion appears to be based primarily on the view that stress can never be a causative factor, a view expressly rejected by the court in *Clayton. For that reason, we accord it less weight.* On balance, we conclude that the preponderance of the medical evidence establishes that claimant's work connected exertion was a precipitating factor in the onset of claimant's myocardial infarction." (Emphasis added)

57 Or App at 625-26, 646 P2d at 84-85. The Court of Appeals reversed the Workers' Compensation Board's decision, in which the claim was held not to be compensable.

We allowed review under ORS 2.520 to clarify the effect of our decision in *Clayton v. Compensation Department, supra.*

Under the rule of *Weller v. Union Carbide,* 288 Or 27, 29, 602 P2d 259 (1979), we take the following historical facts as found by the Court of Appeals:

"At the time of the incident, claimant was 55 years old. He was employed by Coos Head Timber Company. For most of the previous six years claimant's job as 'planer feeder' had entailed relatively light work in a seated position turning over pieces of lumber. Two weeks before the incident, claimant was transferred to a position on the 'green chain' that involved removing from a conveyor belt green lumber up to 2 inches by 6 inches by 16 feet in dimension. That job was more strenuous. Claimant testified that on the new job he was physically exhausted by the end of the day. On the morning in question, claimant's shift began at 7 a.m. Between 8:15 and 8:30 a.m., he began to experience pain in his chest, nausea and general fatigue. He left work at 9 a.m. and sought medical attention from a physician in North Bend, who administered an EKG test. The results of that test suggested an early anterior infarction. Claimant was admitted that day to the intensive care unit of the local hospital. Enzyme studies and further EKG tests revealed development of an anterior-lateral myocardial infarction. Claimant was released from the hospital on March 13, 1980.

"Subsequently, a cardiac specialist in Eugene, to whom claimant had been referred, performed a coronary angiogram, which revealed several cardiac abnormalities, including constriction of one branch of the coronary arteries and total occlusion of one artery."

*Bales v. SAIF,* 57 Or App 621, 623, 646 P2d 83 (1982).

The "physician in North Bend," a general practitioner, opined by letter, which was received by SAIF on April 7, 1980, that

"pulling on the green chain * * * was a materially contributing cause of his myocardial infarction."

This opinion was rendered by the treating physician after he had the benefit of consultation with the "cardiac specialist in Eugene" who performed the coronary angiogram.

By letter dated April 8, 1980, SAIF denied the claim.

By letter dated April 11, 1980, SAIF asked the Eugene specialist for an opinion whether the work activity

caused the heart condition or if the condition was the result of "natural disease progress." The Eugene specialist wrote, *in toto:*

> "It is my opinion that the myocardial infarction sustained by Orville A. Bales on March 3, 1980, was related to a natural disease process and was neither directly nor indirectly related to his work activity."

Claimant's counsel wrote to a cardiologist who taught at the University of Oregon Health Sciences Center, requesting his opinion on causation. The teaching cardiologist had the entire medical file to examine and was made aware of the conflicting opinions of the North Bend and Eugene doctors as to causation. The teaching cardiologist did not physically examine the claimant but expressed his conclusion as follows:

> "To recapitulate, it would be my medical opinion that Mr. Bales' work activity was a material and significant factor in contributing to the development of his acute myocardial infarction of that date."[1]

At the hearing before the referee, the medical and hospital files and the reports of the three doctors were received in evidence. The testimony of the Eugene specialist upon deposition was also received. To get the full flavor of that witness' testimony, we shall quote liberally from the deposition. Upon examination by claimant's counsel, the witness was asked the reason for his letter opinion in full, *supra.*

> "Q. What is your reason for your opinion of that?
>
> "A. I don't believe that exertion causes heart attacks. I don't believe there is any evidence exertion or emotional stress causes heart attacks.

---

[1] In arriving at his opinion, the cardiologist assumed correctly that the claimant was engaged in work on the morning in question that was more strenuous than the work he had previously performed. He also assumed that the claimant, at the relevant time, had been involved in pulling "heavy timbers" off the green chain. The words "heavy timbers" were not used by any witness at the later hearing before the referee to describe the kind of lumber claimant was pulling from the green chain. It appears to be uncontradicted that the green lumber he was pulling was sometimes one inch, and sometimes two inches thick, that it was from three to six inches wide, and some of it was up to twenty-four feet long. It seems fair to say that the heaviest lumber he pulled, therefore, would be a green 2×6, twenty-four feet long. There is no direct evidence as to what such a piece of "dimension" lumber would weigh.

"I don't believe there is anything in the literature in the world that supports that. And so, I don't think that you can relate a disease process to his work activity.

"Q. Doctor, in your opinion, can stress, emotional or exertional stress contribute to a heart attack?

"A. Not necessarily in this case.

"Q. But, just in general terms, can it contribute?

"A. That's an impossible question to answer. I, of course, don't know. I think no one does.

"Q. In your opinion is what I'm interested in.

"A. In my opinion I think—

"[SAIF'S COUNSEL]. I think he said he had no opinion.

"THE WITNESS: This does not cause heart attacks, physical or emotional stress.

"Q. [CLAIMANT'S COUNSEL]. I want to make sure that we distinguish between a cause, a sole cause and a contributing cause."

"Heart attacks result from people like Mr. Bales suffering from coronary artery disease primarily caused by lack of sufficient blood supply to the heart muscles, isn't that correct?

"A. No one knows.

"Q. No one knows.

"A. That's right.

"Q. No one knows what causes the attack?

"A. That's right.

"Q. And in your opinion what causes the attack?

"A. I don't know.

"Q. And if you do not know what causes it, Doctor, how can you say that work activity or stresses is not a cause or contributing cause?

"A. On the basis of statistics. It's one thing that we do have, are a number of statistics that show that people have heart attacks at all hours of the day and night and has no relation to what they're doing.

"There's no indication that physical or emotional activity relates to the onset of myocardial infarction.

"Q. And so, on that basis you conclude that exertion has—is not a cause.

"A. Right."

The doctor went on to distinguish between a heart attack and "sudden death syndrome."

"A. You see, there you're talking about the sudden death syndrome. The sudden death syndrome is a different thing. That's not a heart attack.

"And sure, sudden death syndrome is related to physical exercise.

"Q. What is the sudden death syndrome?

"A. It's dying suddenly for no apparent cause. And generally, at the postmortem exam you find nothing, perhaps find extensive coronary artery disease. And you assume that the patient developed a sudden rhythm disturbance that caused death.

"And I think that that may be an area of confusion, because there is a definite relationship between physical activity and the sudden death syndrome, particularly in coronary disease patients. But, they don't make it to the hospital to show that they have a heart attack.

"In fact, heart attacks don't come about as a result of physical or emotional stress."

Claimant's counsel sought to ascertain what the doctor meant by a heart attack:

"Q. What is a heart attack then?

"A. Well, a heart attack is the damage of heart muscle. And that's caused — we don't know what causes it, but it's a situation where there is congestion of the blood vessels in the heart there, oxygen cannot be exchanged from the arteries to the veins in the normal process and that heart muscles die because of lack of oxygen.

"What triggers it, what is the process, no one knows.

"Q. You say it is caused by congestion in the blood vessels within the heart.

"A. Within the heart.

"Q. Occlusion of the coronary artery supplying the heart, would that produce a heart attack?

"A. Well, yes, if blood vessels blocked off or occluded from an artery supplying an area of the heart, that usually will produce a heart attack. Not always, but usually.

"Q. And that can occur without a congestion of the vessels within the heart itself?

"A. You are really getting into technical pathalogical [sic] areas.

"No, they develop congestion of blood vessels. That's part of the injury process is that congestion occurring. That's what happens as the injury progresses, they develop congestion and they don't exchange oxygen."

Claimant's counsel returned to the issue of causation:

"Q. Doctor, in your opinion, can — and if I am understanding you correctly, in your opinion, then, is that exertion or stress, physical or otherwise, is — can never be a causative factor in a heart attack?

"A. I never say never.

"Q. Well, I am seeking your opinion.

"A. My opinion is that it is not a factor in the vast majority of heart attacks. Not any kind of factor, not direct or indirect.

"Q. And you say in the vast majority. That implies that in some cases it might be.

"A. As I say, I never say never. I can't know what a small percentage — an unusual situation it might be a factor. That's why I was hanging back on waiting so long to answer your question before. Because, it, of course, there is a shadow of the question in any circumstance.

"Q. Doctor, in your opinion, is that the prevailing medical view on that subject?·

"A. Among my colleagues in this state, yes.

"Q. Are you acquainted with a Dr. Herbert Griswold?[2]

"A. He is the exception.

"Q. He is the one exception?

"A. I wouldn't say that. He is a major exception.

"Q. He has a contrary view?

---

[2] Dr. Griswold is the cardiologist from the University of Oregon Health Sciences Center mentioned earlier in the text.

"A. Yes.

"Q. And there are others that, I believe, share his view.

"A. Maybe a few.

"Q. Is that the — is your view the prevailing view taught at the University of Oregon Health Sciences?

"A. I really don't know.

"Q. Doctor, a person with coronary artery disease, has restricted pumping, so far as blood supply to the heart is concerned, is that correct?

"A. Has restricted blood flow in the coronary arteries.

"Q. Do you know if such a person engages in strenuous physical activity, or anybody that engages in strenuous physical activity are going to create a demand for more blood to the muscle or oxygenation, is that correct?

"A. Right.

"Q. What effect does that fact that they can't get it there, people with coronary artery disease or coronary artery insufficiency, what happens when the blood, they can't provide enough blood flow through those restricted vessels through those heart muscles?

"A. They usually get pain.

"Q. And that's call[ed] angina?

"A. Yes.

"Q. And if they continue exerting with pain, what happens?

"A. I've never seen anybody that did that.

"Q. What happens if, Doctor, if the heart does not get enough blood and demand is such that the heart just doesn't get enough blood to supply its needs?

"A. Well, the muscle dies.

"Q. And that's what's involved in the heart attack?

"A. Yes.

"Q. But, again, it's your opinion that that can't be caused by exertion.

"A. Right.

"Q. And again, Doctor, as I understood what you've told us, that you just don't know what causes heart attacks.

"A. That's right.

"Q. And we don't know what caused the heart attack in this case, Mr. Bales' case?

"A. That's right.

"Q. But, there's no question but that he did have a heart attack?

"A. Yes."

On examination by SAIF's counsel, the witness elaborated:

"Q. One last question: Can you give us an idea of the percentage of your colleagues that would agree with you and disagree with Dr. Griswold on the idea of the role exertion plays in producing myocardial infarction?

"[CLAIMANT'S COUNSEL]. Let's define colleagues, first.

"Q. [SAIF'S COUNSEL]. I assume, when you used the term, colleagues, you were talking about cardiologists in the State of Oregon.

"A. Yes. I think cardiologists in large, that I have talked to, cardiologists all over the world, I would say, that probably 75 percent believe that physicial exertion and emotional stress don't cause heart attacks. And there is an article in circulation, 1962, which is a committee on cause and effect, or cause of — I can't remember the exact title, I'm sorry. I could give it to you. But, in that article it says that there is no evidence that myocardial infarction is caused by physical or emotional stress.

"That is a statement of a committee of the American Heart Association. That has never been changed. The majority of cardiologists today still support that statement."

We turn to an examination of the precise question presented to us in *Clayton v. Compensation Department, supra.* The claim was for an accident which occurred in 1965 and was, therefore, tried by jury under the then-existing law in workers' compensation cases. The claimant had suffered a fatal heart attack while he was on the job. This court stated the crucial question as being whether the stress and fatigue suffered by claimant on the job was a causal factor in producing his heart attack. The only medical witness was the same cardiologist, Dr. Griswold, who rendered an opinion favorable to the claimant in the case at

bar. In *Clayton,* the witness testified that the medical profession does not "understand how stress may or may not contribute to such an episode." He indicated that the question in Clayton's case on causation was close but that:

> "The reasonable probability is that more chance that it did than it didn't."

253 Or at 401. The defendant moved for a directed verdict on the ground that this was insufficient to carry the case to the jury on the issue of causation. The trial judge allowed the motion but submitted the case to the jury under then ORS 18.140(2).[3] The jury found, in answer to an interrogatory, "that the work activity of the plaintiff * * * [was] a material, contributing, precipitating or causal factor in producing or hastening the death of" plaintiff. The trial court thereafter entered judgment notwithstanding the verdict for defendant on the trial court's perception of Dr. Griswold's testimony as not being sufficient to establish a medical probability of causation. The question on appeal in *Clayton,* therefore, was whether the court could say there was no evidence to support the verdict. Oregon Constitution, Article VII (Amended), Section 3. The *question was not* whether this, or any, court should subscribe to any particular school of medical thought. Where a verdict is directed against a party, or where judgment notwithstanding the verdict is entered after verdict, the losing party is entitled to have all evidence in his favor considered as being true.

 This court made the statement that:

> "*We* have chosen to reject the view that exertion or stress can never be a causative factor in these cases." (Emphasis added)

253 Or at 402. It is a strange statement, considering our role under the constitution. We were not required to enter upon factfinding in *Clayton;* we did not cite any other case in which we had made such a finding. The statement is not,

---

[3] ORS 18.140(2) provided:

"In any case where, in the opinion of the court, a motion for a directed verdict ought to be granted, it may nevertheless, at the request of the adverse party, submit the case to the jury with leave to the moving party to move for judgment in his favor if the verdict is otherwise than as would have been directed."

*Compare,* ORCP 63B.

and clearly should not have been, a rule of law. We concluded that the evidence in *Clayton* was sufficient to present a case for the jury's resolution as a matter of fact. Our result was correct, but the case does not stand for the proposition that any given witness' testimony is to be disregarded as a matter of law because of the school of medical thought to which he belongs. On the other hand, the testimony of a medical witness should not necessarily be given less weight, as a matter of law, simply because he espouses the thoughts of a minority of the medical profession.[4]

Because the Court of Appeals believed that this court *required* that the Eugene specialist's opinion was to be given less weight because of his faction's school of thought that stress never causes heart attacks, the cause must be remanded for the Court of Appeals to exercise its factfinding function upon the basis of what weight that court finds should be accorded to the testimony.

Reversed and remanded to the Court of Appeals.

---

[4] The medical truth of yesterday may well be the laughing stock of today; today's medical truth may be likewise treated tomorrow. History teaches us that the vast majority of doctors 100 years ago, both in practice and in the universities and hospitals, believed Dr. Ignaz Phillipp Semmelweis not only to be wrong, but probably not completely sane, simply because he insisted that a doctor ought to wash his hands with a watery solution of chloride of lime before delivering a baby if the doctor had just been dissecting a cadaver or engaged in some other activity that had caused the doctor's hands to become unclean. Semmelweis' observations of the high incidence of puerperal fever in mothers whose babies were delivered with the assistance of doctors whose hands and clothing were unclean led him to believe there was a causal connection between the lack of cleanliness and the ensuing fever. *See, e.g.,* "Immortal Magyar" by Frank G. Slaughter, M.D., 1950. The work of Joseph Lister was eventually to explain why Semmelweis was right, but he was right even when he was a minority of little more than one. In any field of science, today's truth may tomorrow be shown to be false. Consider the history of the views of planetary revolution. Were Johannes Keppler and Galileo, on the one hand, or those who believed the sun revolved around the earth, on the other hand, correct? Who were in the majority, and who in the minority, in that time?

It is to be remembered that the witness who testifies to an expert opinion is subject to cross examination concerning how he arrived at that opinion, and the cross examiner is to be given great latitude in eliciting testimony to vitiate the opinion. *Wulff v. Sprouse-Reitz Co, Inc.,* 262 Or 293, 309, 498 P2d 766 (1972).

The factfinder must discharge his task on the record made in the particular case. The facts found upon the record and evidence in one case do not become a rule of law to be applied to the determination of the facts upon another record and other evidence. *Bend Millwork v. Dept. of Revenue,* 285 Or 577, 585-587, 592 P2d 986 (1979).