Mark VUKANOVICH,
an individual,
*Plaintiff-Appellant,*

*v.*

Larry KINE,
an individual;
and Larry Kine Properties, LLC,
an Oregon limited liability company,
*Defendants-Respondents,*

*and*

STONECREST PROPERTIES, LLC,
an Oregon limited liability company;
Alan Evans, an individual;
and Charles Kingsley, an individual,
*Defendants.*

Lane County Circuit Court
161011969; A148776

342 P3d 1075

George W. Kelly argued the cause and filed the briefs for appellant.

Craig R. Berne argued the cause for respondents. With him on the brief was Harris Berne Christensen LLP.

Before Duncan, Presiding Judge, and Lagesen, Judge, and Schuman, Senior Judge.*

LAGESEN, J.

---

* Lagesen, J., *vice* Wollheim, S. J.

**LAGESEN, J.**

Plaintiff Mark Vukanovich and defendant Larry Kine (defendant) entered an agreement to work together to purchase a parcel of real property from Umpqua Bank (Umpqua or the bank). Plaintiff previously owned the property, but lost it to the bank when he could not meet his loan obligations. For reasons disputed by the parties, the joint endeavor failed, and the parties became competitors, each seeking to purchase the property from the bank. The bank rejected plaintiff's offer and accepted defendant's offer, and plaintiff sued defendant for fraud and breach of contract, including breach of the implied covenant of good faith and fair dealing. Plaintiff also sued Larry Kine Properties, LLC (Kine Properties), a company owned by defendant's wife and managed by defendant, asserting claims for breach of contract, including breach of the implied covenant of good faith and fair dealing, and intentional interference with economic relations.[1] After a jury returned a verdict in favor of plaintiff on all claims, the trial court entered judgment in favor of defendants, granting defendants' motion for judgment notwithstanding the verdict (JNOV)[2] and, alternatively, ruling

---

[1] Plaintiff also sued the investors who joined with defendant to purchase the property, Alan Evans and Charles Kingsley, as well as the limited liability company that defendant, Evans, and Kingsley formed to purchase the property, Stonecrest Properties, LLC (Stonecrest). The trial court granted summary judgment to Evans, Kingsley, and Stonecrest. Although plaintiff appealed that ruling, plaintiff and those defendants ultimately settled, and those defendants have been dismissed from this appeal, leaving Kine and Kine Properties as the only remaining respondents on appeal. For ease of reading, this opinion refers to defendant Kine as "defendant" and to defendant Kine Properties by name. References to "defendants" encompass both Kine and Kine Properties.

[2] Defendants moved for a directed verdict on all claims. Although the trial court concluded that defendants were entitled to a directed verdict on each of the claims against them, the court submitted the case to the jury under the procedure authorized by ORCP 63 B:

"In any case where, in the opinion of the court, a motion for a directed verdict ought to be granted, it may nevertheless, at the request of the adverse party, submit the case to the jury with leave to the moving party to move for judgment in such party's favor if the verdict is otherwise than as would have been directed or if the jury cannot agree on a verdict."

After the jury returned the verdict in favor of plaintiff, defendants moved for the judgment as a matter of law as contemplated by the rule, and the trial court granted the motion, describing its decision as "reaffirm[ing] its earlier grant of a directed verdict against Plaintiff." On appeal, the parties dispute whether the court's ruling should be characterized as the grant of a directed verdict or the

that the equitable doctrines of unclean hands and estoppel bar plaintiff from recovering on any of his claims. We conclude that the trial court erred in granting the JNOV on the contract claim and in concluding that the doctrines of unclean hands and equitable estoppel bar plaintiff's recovery and, accordingly, reverse the judgment and reinstate the jury's verdict on the contract claim. We otherwise affirm.

## I. BACKGROUND

### A. *Substantive Facts*[3]

Plaintiff is a real estate developer with several decades of varying experience in the industry. In spring 2007, he purchased a 43-acre parcel of land in Eugene, Oregon (the city), with a $4.629 million loan from Umpqua. Plaintiff intended to divide the parcel into 102 residential lots and construct the infrastructure needed for a residential development. He planned to sell the lots in two phases: 40 lots in Phase 1 and 62 lots in Phase 2. To meet city requirements, plaintiff purchased two bonds to ensure the construction of the infrastructure for the lots. Plaintiff and his wife personally guaranteed the bonds.

The Phase 1 lots were ready for sale in late 2007, but they did not sell as planned. By early 2009, plaintiff was struggling to make payments to Umpqua, and the bank initiated foreclosure proceedings. Plaintiff attempted to negotiate with the bank in order to retain the property and, among other things, offered to pay $2.25 million to the bank

grant of a JNOV. We believe that where, as here, a court submits a case to a jury under ORCP 63 B, the jury returns a verdict in favor of one party, and the court ultimately enters judgment for the other party notwithstanding that verdict, the court's action is properly characterized as the grant of a JNOV. Regardless of characterization, our standard of review is the same. *See Bales v. SAIF*, 294 Or 224, 234, 656 P2d 300 (1982) (noting that, "[w]here a verdict is directed against a party, or where judgment notwithstanding the verdict is entered after verdict, the losing party is entitled to have all evidence in his favor considered as being true").

[3] Plaintiff's version of the facts differed significantly from defendant's version of the facts in key respects; the parties' testimony was flatly contradictory in a number of instances. As required by our standard of review (discussed in the text), our statement of the facts reflects plaintiff's version of events, to the extent that the evidence, and reasonable inferences drawn from the evidence, would permit a reasonable factfinder to find that plaintiff's version was more likely than not the true version of events.

in exchange for the property and a release from the loan obligation. Those negotiations failed, and, in August of that year, the bank accepted a deed-in-lieu of foreclosure and fully released plaintiff from his loan obligations. Plaintiff nevertheless remained hopeful that he might reacquire the property in the future.

Defendant, who is a real estate broker and developer, first met plaintiff while plaintiff was still in negotiations with the bank. Defendant was representing four or five clients who wanted to purchase lots from plaintiff, but the bank refused to release any lots for sale at the prices offered by defendant. Notwithstanding the failed transactions, defendant's interest in the property was piqued, and he attempted to purchase it from the bank after the bank obtained the deed-in-lieu of foreclosure from plaintiff. Defendant offered $1.43 million for the property, but the bank rejected that offer, stating that it would accept no less than $2 million.

Defendant later told plaintiff about his attempt to purchase the property. Plaintiff was not "real pleased" to learn that defendant was attempting to acquire the property, which plaintiff still viewed as his own, and "felt like the worst thing for us to do was to start creating a competition." Plaintiff and defendant then agreed to work together to purchase the property, and they executed a written "Letter of Understanding" reflecting that agreement. It provided:

> "Larry Kine and Mark Vukanovich are working in conjunction to purchase property in Eugene, Oregon, known as Moon Mountain Subdivision from Umpqua Bank.

> "Mark Vukanovich is the original developer of the project and has signed a deed in lieu to Umpqua Bank . . . said deed is in the process of being recorded.

> "Larry and Mark are responsible for bringing in 50% of the dollars needed to purchase the property from Umpqua Bank including costs associated with Bonding, Erosion Control and City Fees. It is anticipated that the land will be purchased for $1,750,000 and the associated costs will be $90,000 for a total investment of $1,840,000.

"Profits will be split 50% to Larry's group and 50% to Mark's group. A new LLC will be formed as the purchaser of the property.

"Mark and Larry will be equally responsible for management and decisions made. Larry will focus more on lot sales and any home construction activity and Mark will focus more on the land development issues.

"The Pro Forma has reflected 10% of sales price to be allocated for commissions, closing costs, marketing costs, etc. Any of these dollars not given to outside sources (outside agent, newspaper advertising, etc.) will be split 50% to Larry and 50% to Mark for their individual efforts.

"Each party agrees to keep this transaction confidential. Information is to be limited only to those parties that are considered 'Need to Know'. Any new potential investor must sign a confidentiality agreement so as to limit potential competition from other parties.

"Both parties feel that they are able to come up with the required funds to purchase the property on their own. We have agreed to work jointly on this project."

(Ellipsis in original.)

A month after entering into their agreement, the parties made their first joint offer to the bank, in the amount of $1.51 million. Although plaintiff and defendant worked together on that offer, defendant extended the offer to the bank, and the proposed sales agreement identified the purchaser as "Larry Kine Properties, LLC." Umpqua rejected that offer.

While the parties were putting together their offers, plaintiff shared a substantial amount of information with defendant that plaintiff would not have shared absent their agreement to jointly purchase the property. Among other things, plaintiff and defendant discussed plaintiff's bonds. At one point, defendant suggested to plaintiff that they tap the bonds to pay for the Phase 2 infrastructure and that, "if the bond company comes after [plaintiff], [he] [could] file for bankruptcy." Plaintiff told defendant "that's not an option for me financially or ethically." Defendant nonetheless continued to explore the potential use of the bonds, discussing the possibility with his other investment partners,

Alan Evans and Charles Kingsley. Defendant wanted the city to enforce the bonds "to build out infrastructure on Phase 2." He further recognized that "[i]t would be very difficult" to accomplish that plan if he remained partners with plaintiff, in light of the fact that the bond company could go after plaintiff for any expenditures it was required to make on the bond.

In early December 2009, the parties made a second joint offer on the property, proposing to purchase it from the bank for $1.71 million. The parties again submitted the offer through defendant and designated "Larry Kine Properties, LLC" as the proposed purchaser. The bank countered with an addendum, which lowered the price to $1.6 million, but specified that the property would be sold "as is" and the deal must close by December 30, 2009. Plaintiff and defendant accepted, agreeing to the terms proposed by the bank.

Plaintiff and his investment partner, Steve Dandurand, were prepared to close the deal by the end of December, as planned. On December 28, two days before the transaction was scheduled to close, defendant told plaintiff that he and his group were not ready to close the deal and would have to request a 30-day extension. In fact, at that time, defendant intended to terminate his partnership with plaintiff and was working with Evans and Kingsley to purchase the property without plaintiff's involvement, so that defendant could pursue the use of the bonds to pay for the Phase 2 infrastructure. In early January 2010, defendant left a voicemail for plaintiff, requesting that plaintiff provide him more information about the bonds and other details about plaintiff's dealing with the bank, ostensibly for the purpose of "mak[ing] [the parties'] offer back to the bank." Shortly thereafter, on January 12, 2010, the parties spoke again. At that time, defendant told plaintiff both that he no longer wanted to pursue the transaction with plaintiff and that he was not interested in purchasing the property at all:

> "[Defendant] was very quick on letting me know they decided they did not want to move forward on buying the property. There were too many issues and they had—there was other opportunities and they were not going to buy it at all and that was it."

After defendant ended their partnership, plaintiff remained committed to purchasing the property. However, he was not "in a huge rush to go out and make an offer right away," because, in light of defendant's representation that defendant was not going to buy the property, plaintiff "felt time was on [his] side." Meanwhile, defendant, along with Evans and Kingsley, continued to work on their plan to acquire the property and use the bonds to finance the Phase 2 infrastructure. After defendant "hit total pay dirt" in early February 2010 by obtaining documentation regarding the development—including "canceled checks showing the two bonds had been paid and cashed," which would be essential to enforcing the bonds—defendant made a $1.6 million offer on the property. During the same time period, defendant or his investment partners were exerting pressure on the city to enforce the bonds.

Shortly after defendant made his offer to purchase the property, plaintiff independently offered to purchase the property, first for $1.1 million and then for $1.25 million. At the time, plaintiff was aware that an offer had been made on the property, but was unaware that it was defendant who had made that offer. Umpqua ultimately agreed to sell the property to defendant for $1.2 million, and the property was purchased in the name of Stonecrest. Defendant's investment group continued to negotiate with the city regarding the enforcement of the bonds to pay for the Phase 2 infrastructure, and defendant's *pro forma* for the project estimated profits based on the assumption that defendant and his partners would be able to obtain "free infrastructure" by enforcing the bonds.

B. *Procedural Facts*

Plaintiff sued defendant for breach of contract, including breach of the implied covenant of good faith and fair dealing, and fraud. He also sued Kine Properties, alleging claims for breach of contract, including breach of the implied covenant of good faith and fair dealing, and intentional interference with economic relations. At trial, plaintiff's theory on the contractual claim was that defendant breached the express terms of the "Letter of Understanding" and the implied covenant of good faith and fair dealing by

refusing to go through with the agreed-upon purchase of the property based on his determination, using information provided to him in confidence by plaintiff, that he could obtain a better deal for himself and his investment group if he pursued the property separately from plaintiff:

> "So at the end of the day, what happened here? The parties entered into agreement. [Plaintiff], in good faith and relying on the agreement and confidentiality provisions, provided [defendant] with all the information that he had amassed over two to four years of working on this project and developing it, getting the entitlements and doing everything necessary to push this transaction forward. After that, [defendant] and [plaintiff] worked together to purchase the property.

> "In December of 2009 it's clear that a better offer came along. [Defendant] decided to go with the better offer, despite putting his name on a contract with [plaintiff] saying they were going to jointly purchase this property."

Plaintiff's theory of the fraud claim was that, when defendant repudiated the contract in the January 12 phone call, defendant falsely stated that he was no longer interested in purchasing the property; and that plaintiff, thinking he had no competition for the property, justifiably relied on that false statement to delay submitting an offer on the property, ultimately submitting a "lowball" offer, resulting in damage to plaintiff in that he did not succeed in purchasing the property because the bank decided to sell the property to defendant. As plaintiff argued at trial:

> "Now, on the fraud claim. On January 12, [defendant] told [plaintiff], 'We are out of the deal. We're done.' And no one else can tell you what transpired besides [plaintiff] and [defendant] in that conversation. But what we do know is after that conversation, [plaintiff] made an offer to the bank for [$]1.1 million in February of 2010. Now, that was $500,000 less than an offer the bank had just accepted in December.

> "Now, if he knew that there was competition out there, why would he make an offer that was that much less? He knew that he was the only person left, based on the representation by [defendant], going after this property.

"He relied on the representation that they were not interested in the property. He took his time to make an offer. He made a lowball offer and then he finds out after the fact that someone's made an offer prior to him and is already in first position."

Plaintiff's theory of the intentional interference claim was that defendant's February 19, 2010, offer to purchase the property was submitted to the bank under the name of "Larry Kine Properties, LLC," and that, consequently, Kine Properties had interfered with the contract between plaintiff and defendant.

At the close of plaintiff's case, defendant moved for a directed verdict on all claims. The trial court granted the motion but submitted the case to the jury pursuant to ORCP 63 B. The jury found in favor of plaintiff on all claims, awarding plaintiff $686,000 on the breach of contract claim, $1,063,000 in economic damages and $75,000 in noneconomic damages on the fraud claim, and $650,000 in economic damages and $75,000 in noneconomic damages on the intentional interference claim. Notwithstanding the verdict, defendants moved for entry of judgment as a matter of law in accordance with ORCP 63 B. The trial court granted the motion, renewing its rulings on defendants' motion for a directed verdict. The court also ruled, in the alternative, that the equitable doctrines of unclean hands and estoppel barred plaintiff's recovery on all claims. Plaintiff timely appealed, assigning error to the trial court's grant of a JNOV to defendant on the fraud and breach of contract claim,[4] to the trial court's grant of a JNOV to Kine Properties on the intentional interference with economic relations claim, and to the trial court's ruling that plaintiff's recovery is barred by the doctrines of unclean hands and estoppel.[5]

## II.  STANDARDS OF REVIEW

Plaintiff's assignments of error implicate two different standards of review. Three of plaintiff's assignments of

---

[4] Plaintiff does not assign error to the trial court's grant of a JNOV to Kine Properties on the breach of contract and fraud claims. Accordingly, with respect to those claims, we address only whether there was evidence to support the jury's verdict against Kine.

[5] Plaintiff also filed a motion for relief from judgment under ORCP 71, raising the same issues that he raises on appeal. The trial court denied the motion.

error challenge the trial court's decision to enter a JNOV. On appeal from a JNOV, we view the evidence "in the light most favorable to the party who prevailed before the jury"—here, plaintiff—and examine "the record to ascertain whether it contains evidence which supports the verdict." *Jacobs v. Tidewater Barge Lines*, 277 Or 809, 811, 562 P2d 545 (1977). "[O]ur review of the record is circumscribed by the case actually presented to the jury through pleadings, evidence, and jury instructions." *Northwest Natural Gas Co. v. Chase Gardens, Inc.*, 333 Or 304, 310, 39 P3d 846 (2002). We "must reinstate the jury verdict unless we can say affirmatively that there was no evidence to support it." *Bennett v. Farmers Ins. Co.*, 332 Or 138, 147-48, 26 P3d 785 (2001).

Plaintiff's fourth assignment of error challenges the trial court's ruling that the equitable defenses of unclean hands and estoppel bar plaintiff's recovery on all claims. Those defenses—which were tried to the court—are equitable in character and eligible for *de novo* review. *SERA Architects, Inc. v. Klahowya Condominium, LLC*, 253 Or App 348, 362, 290 P3d 881 (2012), *rev den*, 353 Or 533 (2013) (stating that "we review [equitable] defenses according to their character"). However, neither party has requested that we exercise our discretion to review those defenses *de novo*, and this case, on its face, does not appear to be an "exceptional case[]" warranting *de novo* review. *See* ORAP 5.40(8)(c); *see also* ORS 19.415(3)(b) (making *de novo* review discretionary). We therefore review the trial court's legal conclusions for legal error and review its factual findings to determine whether those findings are supported by any evidence in the record. *Drayton v. City of Lincoln City*, 244 Or App 144, 146, 260 P3d 642 (2011).

## III. ANALYSIS

### A. *Judgment Notwithstanding Verdict*

Plaintiff's first three assignments of error challenge the trial court's grant of a JNOV on plaintiff's claims for intentional interference with economic relations, fraud, and breach of contract. For the reasons explained below, we affirm the trial court's ruling with respect to the intentional interference and fraud claims, but reinstate the jury's verdict on the claim for breach of contract.

As an initial matter, we reject plaintiff's assignment of error challenging the grant of a JNOV on the intentional interference claim for procedural reasons. Plaintiff has not identified any evidence in either his opening brief or his reply brief that would support the jury's verdict on that claim. Instead, plaintiff quotes the allegations in the complaint and argues that "the evidence supports each allegation in the complaint," without specifying what the evidence is or where we might locate it in the record. As we have previously held, "[w]e are not required to search the record for the evidence to support [plaintiff's] assignments of error, and we will not do it." *Tidewater v. Wheeler*, 55 Or App 497, 502, 638 P2d 499, *rev den*, 292 Or 722 (1982). That prudential, procedural rule has particular force on appeal from the grant of a JNOV, where we are asked to determine whether there is "any" evidence to support the jury's verdict; if there is "any" evidence to support the verdict, it is the appellant's responsibility to direct us to that evidence. For that reason, we reject plaintiff's contention that the trial court erred in granting a JNOV on the intentional interference claim.

We also reject plaintiff's assignment of error challenging the grant of a JNOV on the fraud claim, concluding both that plaintiff presented insufficient evidence to permit the jury to find either that plaintiff justifiably relied on a false statement by defendant or that plaintiff suffered damages resulting from such reliance. *See Cocchiara v. Lithia Motors, Inc.*, 353 Or 282, 296-97, 297 P3d 1277 (2013) (noting that two elements of a fraud claim are justifiable reliance on a misrepresentation and resulting damages).

As this court has explained,

"[t]he requirement that a plaintiff's reliance be justified serves as a balance between, on the one hand, the policy that a person who intentionally deceives another should not be allowed to profit from the deception and, on the other hand, the recognition that the person deceived, as an autonomous individual, should be responsible for protecting his or her own interests when making a decision."

*Murphy v. Allstate Ins. Co.*, 251 Or App 316, 324, 284 P3d 524 (2012). Whether reliance on an alleged misrepresentation is

justifiable turns on "the totality of the parties' circumstances and conduct." *OPERB v. Simat, Helliesen & Eichner*, 191 Or App 408, 428, 83 P3d 350 (2004). Among other things, for reliance to be justifiable, the party claiming reliance must have taken "reasonable precautions to safeguard [his or her] own interests" under the particular circumstances of the case. *Gregory v. Novak*, 121 Or App 651, 655, 855 P2d 1142 (1993); *see Coy v. Starling*, 53 Or App 76, 80, 630 P2d 1323, *rev den*, 291 Or 662 (1981). What precautions a person must take to protect his or her own interests turns on the nature of the person's relationship with the person making the alleged misrepresentation, and that person's experience and sophistication with the type of transaction at issue, as well as with the subject matter of the misrepresentation. *See OPERB*, 191 Or App at 427-28.

On this record, we agree with the trial court that no reasonable factfinder could find that plaintiff's reliance on defendant's alleged misrepresentation was justified, because no reasonable factfinder could find that plaintiff took reasonable precautions to safeguard his interest in competing for the opportunity to purchase the property from the bank. As noted, plaintiff asserts that he relied on defendant's representation that he was no longer interested in purchasing the property in determining that he could both proceed slowly on submitting a new offer to the bank and could make a low offer on the property, without concern for any competition from defendant. However, at the time that defendant made the alleged misrepresentation, plaintiff was aware that his joint efforts to purchase the property with defendant had ended, and, as a result, the parties had returned to their earlier status as potential competitors. Plaintiff was an experienced land development professional who knew that the market was competitive; the reason that plaintiff had entered into the agreement with defendant in the first place was to minimize competition for the property. Plaintiff also knew that, before the parties had entered their agreement to attempt to jointly purchase the property, defendant had submitted a bid on the property and was a potential competitor for the property. Further, plaintiff acknowledged that, when defendant informed him that he no longer wanted to pursue the joint purchase, plaintiff "was a little relieved"

because, as they had worked together, plaintiff had come to "not feel comfortable" with defendant's business practices. Given those circumstances, no reasonable factfinder could find that plaintiff took reasonable precautions to protect his own interests in competing to purchase the property when plaintiff, a sophisticated real estate professional, relied on the representation of a potential competitor whom he already distrusted for the proposition that plaintiff could take his time formulating a lowball offer for the property without concern for whether defendant might compete against him for the property.

In addition, the evidence in the record is also insufficient to support a finding that plaintiff suffered damages as a result of his reliance on defendant's misrepresentation regarding his interest in purchasing the property. On appeal, plaintiff asserts that, from the evidence that (1) plaintiff "delayed * * * the making of a new offer" as a result of defendant's misrepresentation and (2) plaintiff's offer therefore came in later than defendant's, a factfinder could infer that plaintiff would have succeeded in purchasing the property in the absence of defendant's tortious conduct. We disagree. On this record, it is speculative whether plaintiff could have succeeded in purchasing the property from the bank. When, and to whom, to sell the property was within the discretion of the bank; the bank had rejected multiple offers on the property; and plaintiff presented no testimony from a bank representative or any other evidence as to what, in particular, the bank was looking for in terms of offers on the property. It, therefore, cannot be inferred that the bank would have accepted an offer from plaintiff had plaintiff only acted with more alacrity. Moreover, there is no evidence that plaintiff had the capacity to put together an offer that would have had more appeal for the bank than the ones that it had previously rejected or the one submitted by defendant. That is particularly so in light of the fact that, although defendant's offer initially was greater than plaintiff's $1.25 million offer, defendant subsequently reduced his offer below that amount, yet the bank still opted to sell the property to defendant rather than to plaintiff.

We reach a different conclusion regarding the trial court's grant of a JNOV on the contract claim. As developed

at trial, plaintiff's claim for breach of contract was predicated on the theory that defendant breached both the express terms of the parties' "Letter of Understanding" and the implied covenant of good faith and fair dealing,[6] damaging plaintiff by cutting plaintiff and his investment partner out of an ownership interest in the property and the profits generated by the property. The record contains sufficient evidence permitting the jury to find in plaintiff's favor on that theory.

Specifically, based on the evidence presented at trial, the jury could permissibly find that plaintiff and defendant entered into a contract to buy the property together and that defendant breached the express terms of that contract when, after the bank accepted the parties' joint offer to purchase the property in December 2009, defendant refused to close on the purchase and subsequently repudiated the contract, even though defendant had the capacity to close the agreed upon December 2009 purchase of the property. The jury also could permissibly find that defendant lied to plaintiff about the reasons for not closing the December 2009 purchase of the property from the bank and used confidential information provided by plaintiff to develop a more lucrative plan for the property that cut out plaintiff, thereby breaching the implied covenant of good faith and fair dealing. Finally, the jury could find that defendant's breaches damaged plaintiff—that, but for those breaches, the December 2009 purchase would have been completed, and plaintiff would have been a part owner of the property and would have been entitled to a share of the profits that the property was expected to earn.[7]

---

[6] "All contracts include an implied covenant of good faith and fair dealing." *Morrow v. Red Shield Ins. Co.*, 212 Or App 653, 661, 159 P3d 384 (2007). That implied covenant requires the parties "to facilitate performance and enforcement of the contract when it is consistent with and in furtherance of the agreed-upon terms of the contract, or where it effectuates the parties' objectively reasonable expectations under the contract[.]" *Id.* at 661-62. Breach of the covenant is a breach of the contract. *See generally Northwest Natural Gas Co.*, 333 Or at 310-13 (treating claim of breach of implied covenant of good faith and fair dealing as claim of breach of contract).

[7] On that point, we note that the amount of the jury's damages award on the breach of contract claim reflects approximately that portion of the profits from the property to which, according to the evidence presented at trial, plaintiff would have been entitled, had the property been purchased jointly with defendant.

Notwithstanding that evidence, defendant argues that the trial court correctly granted the JNOV on the contract claim. Specifically, defendant argues that the JNOV was proper because, *after* the agreement was undisputedly terminated in January 2010, both plaintiff and defendant made separate attempts to purchase the property. Defendant contends that his efforts to purchase the property after the contract was terminated could not constitute a breach of the parties' contract because, at that point in time, both parties understood that the agreement was over and were engaging in similar conduct.

The problem with defendant's argument is that plaintiff ultimately did not predicate his breach of contract claim on defendant's conduct of purchasing the property separately from plaintiff. Although the complaint identified defendant's separate purchase of the property as "among" the breaches committed by defendant, plaintiff's focus at trial—and in opposing the motion for a JNOV on the contract claim—was on defendant's conduct in December 2009: specifically, defendant's refusal to complete the purchase of the property with plaintiff, his surreptitious use of the information that plaintiff had provided him to devise a more favorable transaction for himself and his other business partners, and his lies to plaintiff about his reasons for not closing the deal.[8] It is the evidence of that conduct, not the evidence of defendant's conduct following the termination of the contract, that permits the finding that defendant breached the parties' contract, damaging plaintiff by causing the planned December 2009 purchase of the property to fail. Accordingly, the trial court erred by granting the JNOV on the contract claim.

---

[8] Plaintiff further articulated his theory that defendant's December 2009 conduct breached the contract in closing argument. Defendant did not object to the closing argument as presenting a theory that was beyond the scope of the pleadings or otherwise suggest, through argument or requested jury instructions, that the jury should be limited to considering only whether defendant's separate purchase of the property constituted a breach of the parties' contract. The jury instructions that were delivered did not limit what conduct the jury could consider in assessing whether defendant had breached the parties' agreement. And, in fact, the instructions specified that plaintiff's contract claim was based, in part, on allegations that defendant had "misrepresent[ed] * * * his intentions with regard to purchasing the Property," "shar[ed] confidential information" with third parties, and used that confidential information "to [his own] advantage."

## B. *Unclean Hands and Estoppel*

Because the trial court erred in granting the JNOV on the contract claim, we must reinstate the jury's verdict on that claim, unless the trial court correctly concluded that defendant's affirmative defenses of unclean hands and estoppel bar plaintiff's recovery on that claim.[9] We conclude that it did not.

The doctrine of "unclean hands" bars a party from recovery on an otherwise valid claim if that party "has engaged in misconduct in connection with the matter for which he or she seeks relief." *Burgdorf v. Weston*, 259 Or App 755, 764, 316 P3d 303 (2013), *rev den*, 355 Or 380 (2014).[10] Among other things, for the doctrine to apply, "the misconduct must be serious enough to justify a court's denying relief on an otherwise valid claim. Even equity does not require saintliness." *North Pacific Lumber Co. v. Oliver*, 286 Or 639, 651, 596 P2d 931 (1979) (noting that court has applied the doctrine when a plaintiff's conduct constituted a crime, fraud, or bad faith). The doctrine of estoppel is similar. It can preclude a person from asserting a right to recovery that the person otherwise would have had if (1) the person, through conduct or statements, makes a false representation; (2) the party making the representation has knowledge of the true facts; (3) the other party is unaware of the true facts; (4) the party making the representation intended for the other party to rely on it; and (5) the other party was induced to act upon the false representation. *Day v. Advanced M&D Sales, Inc.*, 336 Or 511, 518-19, 86 P3d 678 (2004).

---

[9] Because we affirm the trial court's grant of a JNOV on the fraud and intentional interference claims, we express no opinion as to the correctness of the trial court's ruling that the doctrines of unclean hands and equitable estoppel would bar plaintiff's recovery on those claims.

[10] Plaintiff argues that the trial court plainly erred in applying the equitable doctrine of "unclean hands" to plaintiff's contract claim in the light of our holding in *McKinley v. Weidner*, 73 Or App 396, 398-400, 698 P2d 983 (1985), that the doctrine applies only in equitable cases, and that the applicable defense in a "law case" is "*in pari delicto*." However, plaintiff did not preserve that argument below, and the doctrines of "unclean hands" and "*in pari delicto*" are similar enough that we do not think that it was plainly erroneous for the trial court to apply the doctrine of "unclean hands" in this case, absent an objection from plaintiff. As we observed in *McKinley*, the application of the "unclean hands" doctrine, rather that the "*in pari delicto*" doctrine, in a "law case" was only "technically incorrect." 73 Or App at 400.

Here, the trial court concluded that, under both doctrines, the conduct that precluded plaintiff from recovering on his claims was his act of attempting to purchase the property separately from defendant after defendant terminated the contract.[11] The court reasoned that those two doctrines were applicable because, after the end of the contract, both parties "felt it was appropriate they were legally available to go forward and try to negotiate for * * * the repurchase of the property" separately from one another. The court further explained its reasoning as follows:

"[M]y problem here is, we've got two parties doing the same thing. Albeit your client thinks he's in a different position, but two parties entered into a contract, two parties, in my view, testified consistently, together, maybe there were some issues with regard to the date, that this contract had come to an end.

"Which is when the alleged fraud immediately arises, and both parties took the subsequent action of both trying to cut a deal to buy this property without the knowledge of the other party. And that's how my view is on unclean hands and equitable estoppel encompasses all this tortious conduct, basically arises all at the same time and through that same issue.

"* * * * *

"Counsel, the point is, the gravamen of the whole deal is, each party is trying to buy the property. One person is successful, one person is not."

The trial court erred in reaching that conclusion. Although the court's finding that, after defendant terminated the contract, plaintiff attempted to purchase the property on his own without telling defendant is supported by the evidence, that fact is insufficient to permit the conclusion that plaintiff's recovery on his contract claim is barred by unclean hands or by estoppel. The doctrine of unclean

---

[11] It was undisputed at trial that defendant was the one who terminated the contract. Both defendant and plaintiff testified consistently on that point. Their testimony differed, however, as to the date that defendant terminated the contract and as to reasons for the termination. In particular, defendant testified that he called plaintiff on December 28 and said, "You know what, this isn't going anywhere. We're not working together." Plaintiff testified that defendant delivered a similar message on January 12.

hands does not apply, because plaintiff's act of attempting to purchase the property on his own after defendant terminated the contract does not, as a matter of law, constitute "misconduct" warranting the application of the doctrine. Similarly, the doctrine of estoppel does not apply, because plaintiff's conduct of attempting to purchase the property on his own does not, as a matter of law, constitute any sort of false representation on which defendant reasonably could rely for the proposition that plaintiff was waiving his right to seek a remedy for defendant's breach of the parties' contract to acquire the property together.

In short, once defendant terminated the parties' contract, there was nothing impermissible about plaintiff seeking to acquire the property on his own. As plaintiff points out, he likely was required to do exactly that to mitigate the damages he incurred when defendant breached the parties' contract by opting not to close on the agreed-upon December 30, 2009, purchase; had plaintiff succeeded in acquiring the property on his own after defendant ended the parties' joint agreement, then he may not have been damaged at all by defendant's decision to repudiate that agreement.

Defendant notes that he presented evidence of inequitable conduct by plaintiff that occurred before defendant terminated their agreement and argues that we should affirm the trial court's ruling on the "unclean hands" defense based on the evidence of that conduct. We decline to do so. The trial court made explicit on the record that it was relying on plaintiff's post-termination conduct to conclude that the doctrine of "unclean hands" barred plaintiff's recovery, and we are thus unable to infer that the court also found that plaintiff had engaged in the alleged pretermination inequitable conduct, which plaintiff disputed.

Similarly, with respect to estoppel, defendant argues that we should affirm the trial court's ruling on that affirmative defense because the record shows that plaintiff did not attempt to stop the bank from selling the property to defendant or otherwise attempt to assert his claims against defendant until after the sale was complete. We question whether plaintiff's failure to stop defendant from purchasing the property on his own would ever operate to estop plaintiff

from asserting his breach of contract claim. However, in all events, the trial court did not base its estoppel ruling on the fact that plaintiff did not act to prevent defendant from purchasing the property and, as we have explained, the conduct on which the court did predicate its ruling—plaintiff's act of attempting to purchase the property on his own after defendant terminated the contract—is insufficient to establish that plaintiff is barred from recovery on his contract claim under the doctrine of equitable estoppel.

## IV.   CONCLUSION

On the breach of contract claim, we reverse the judgment and remand for entry of judgment reinstating the jury's verdict of $686,000; we otherwise affirm.

Judgment reversed and remanded for entry of judgment reinstating jury's verdict of $686,000; otherwise affirmed.