Argued and submitted November 17, 2017, affirmed February 12, 2020

Mark VUKANOVICH,
an individual,
*Plaintiff-Appellant,*

*v.*

Larry KINE,
an individual; and
Larry Kine Properties, LLC,
*Defendants-Respondents,*
*and*

STONECREST PROPERTIES, LLC,
an Oregon limited liability company;
Alan Evans, an individual; and
Charles Kingsley, an individual,
*Defendants.*

Lane County Circuit Court
161011969; A161984

461 P3d 223

This appeal is the latest in a long history of litigation arising out of a failed housing development in Eugene. After the Court of Appeals remanded the case to the trial court for further proceedings on defendant's equitable defenses to plaintiff's breach of contract claim, the trial court ruled in favor of defendant on his equitable defenses. The trial court ruled in favor of defendant on both equitable estoppel and unclean hands, and, for each defense, the court based its ruling on multiple theories of inequitable conduct, any one of which, if supported, would be sufficient to affirm the court's ruling in favor of defendant. One of those theories was that plaintiff was equitably estopped from recovering on his claim because he failed to disclose to defendant the existence of performance bonds that plaintiff had previously personally guaranteed on the development (bonds theory). Plaintiff now appeals, raising four assignments of error. First, plaintiff assigns error to the trial court's findings of fact that, in plaintiff's view, impermissibly contradict the jury's findings of fact. Second, plaintiff assigns error to the court's use of an "any evidence" standard when making factual findings. Third, plaintiff assigns error to specific factual findings made by the court, arguing that there is not any evidence in the record to support them. Lastly, plaintiff assigns error to the court's legal conclusions on the equitable defenses, arguing that, even if the Court of Appeals accepted the court's findings as supported by evidence, those findings did not meet the elements of the defenses as a matter of law. *Held*: First, the trial court did not make factual findings regarding defendant's equitable estoppel defense that were inconsistent with the jury's findings regarding defendant's fraudulent inducement defense, because the trial court and jury applied different standards of proof. Second, the court did not err in the evidentiary standard that it employed to review the record. Third, evidence in the record supports the court's factual finding that plaintiff's omission of the prior performance

bonds, and his personal guarantee of those bonds, was material to defendant. Lastly, the court did not err in its legal conclusion in favor of defendant on equitable estoppel on the theory that plaintiff failed to disclose the existence of his prior performance bonds to defendant. The trial court's ruling on equitable estoppel on the bonds theory was sufficient to enter a judgment in favor of defendant.

Affirmed.

Charles D. Carlson, Judge.

George W. Kelly argued the cause and filed the briefs for appellant.

Helen C. Tompkins argued the cause for respondents. On the brief were Craig R. Berne and Harris Berne Christensen LLP.

Before Armstrong, Presiding Judge, and Shorr, Judge, and Sercombe, Senior Judge.

SHORR, J.

Affirmed.

Sercombe, S. J., concurring in part, dissenting in part.

**SHORR, J.**

This appeal is the latest development in a long history of litigation arising out of a failed housing development in Eugene. Our most recent opinions concerned an agreement between plaintiff Vukanovich and defendant Kine[1] to work together to purchase a parcel of real property from Umpqua Bank (Umpqua or the bank), and we remanded the case to the trial court for further proceedings on defendant's equitable defenses to plaintiff's claim that defendant breached that agreement. *Vukanovich v. Kine*, 268 Or App 623, 342 P3d 1075 (*Vukanovich II*), *adh'd to as modified on recons*, 271 Or App 133, 349 P3d 567 (2015) (*Vukanovich III*).[2] On remand, the trial court ruled in favor of defendant on the defenses of equitable estoppel and unclean hands. Plaintiff now appeals, raising four assignments of error.

First, plaintiff assigns error to the trial court's findings of fact that, in plaintiff's view, impermissibly contradict the jury's findings of fact. Second, plaintiff assigns error to the trial court's use of an "any evidence" standard when making factual findings. Third, plaintiff assigns error to specific factual findings made by the court, arguing that there is not any evidence in the record to support them. Lastly, plaintiff assigns error to the court's legal conclusions on the equitable defenses, arguing that, even if we accept the court's findings as supported by evidence, those findings did not meet the elements of the defenses as a matter of law. For the reasons that follow, we affirm.

This case has a long and complicated factual background. In *Vukanovich II*, we provided a thorough summary of the historical facts, and our standard of review in that case compelled us to state the disputed facts in the light most favorable to plaintiff. 268 Or App at 626 n 3. In this appeal, however, we do not view the facts in such a light.

---

[1] Plaintiff also sued Larry Kine Properties, LLC (Kine Properties), a company owned by defendant's wife and managed by defendant. Plaintiff makes no attempt to distinguish between Kine and Kine Properties as separate defendants, referring to them collectively as "defendant." We do so as well.

[2] *Vukanovich v. Kine*, 251 Or App 807, 285 P3d 733 (2012), *rev den*, 353 Or 203 (2013) (*Vukanovich I*) concerned a dispute over the validity of a "notice of *lis pendens*," an issue that is unrelated to the issues in this case.

Instead, because plaintiff challenges the trial court's rulings and findings of fact on the equitable defenses, we review the court's legal conclusions for legal error and its factual findings to determine whether the findings are supported by any evidence in the record. *Id.* at 633. Therefore, we quote below the relevant facts as they were presented in *Vukanovich II* in order to provide a full context for this factually complicated case. To the extent that factual disputes exist or conflict with those facts that were found by the trial court on remand, we note those disputed facts in the relevant section of the analysis below.

"Plaintiff is a real estate developer with several decades of varying experience in the industry. In spring 2007, he purchased a 43-acre parcel of land in Eugene, Oregon (the city), with a $4.629 million loan from Umpqua. Plaintiff intended to divide the parcel into 102 residential lots and construct the infrastructure needed for a residential development. He planned to sell the lots in two phases: 40 lots in Phase 1 and 62 lots in Phase 2. To meet city requirements, plaintiff purchased two bonds to ensure the construction of the infrastructure for the lots. Plaintiff and his wife personally guaranteed the bonds.

"The Phase 1 lots were ready for sale in late 2007, but they did not sell as planned. By early 2009, plaintiff was struggling to make payments to Umpqua, and the bank initiated foreclosure proceedings. Plaintiff attempted to negotiate with the bank in order to retain the property and, among other things, offered to pay $2.25 million to the bank in exchange for the property and a release from the loan obligation. Those negotiations failed, and, in August of that year, the bank accepted a deed-in-lieu-of-foreclosure and fully released plaintiff from his loan obligations. Plaintiff nevertheless remained hopeful that he might reacquire the property in the future.

"Defendant, who is a real estate broker and developer, first met plaintiff while plaintiff was still in negotiations with the bank. Defendant was representing four or five clients who wanted to purchase lots from plaintiff, but the bank refused to release any lots for sale at the prices offered by defendant. Notwithstanding the failed transactions, defendant's interest in the property was piqued, and he attempted to purchase it from the bank after the bank obtained the deed-in-lieu-of-foreclosure from plaintiff.

Defendant offered $1.43 million for the property, but the bank rejected that offer, stating that it would accept no less than $2 million.

"Defendant later told plaintiff about his attempt to purchase the property. Plaintiff was not 'real pleased' to learn that defendant was attempting to acquire the property, which plaintiff still viewed as his own, and 'felt like the worst thing for us to do was to start creating a competition.' Plaintiff and defendant then agreed to work together to purchase the property, and[, on September 29, 2009,] they executed a written 'Letter of Understanding' reflecting that agreement. It provided [in relevant part]:

> "'Larry Kine and Mark Vukanovich are working in conjunction to purchase property in Eugene, Oregon, known as Moon Mountain Subdivision from Umpqua Bank.

> "'Mark Vukanovich is the original developer of the project and has signed a deed in lieu to Umpqua Bank ... said deed is in the process of being recorded.

> "'Larry and Mark are responsible for bringing in 50% of the dollars needed to purchase the property from Umpqua Bank including costs associated with Bonding, Erosion Control and City Fees. It is anticipated that the land will be purchased for $1,750,000 and the associated costs will be $90,000 for a total investment of $1,840,000.

> "'*****.'

"*****

"A month after entering into their agreement, the parties made their first joint offer to the bank, in the amount of $1.51 million. Although plaintiff and defendant worked together on that offer, defendant extended the offer to the bank, and the proposed sales agreement identified the purchaser as 'Larry Kine Properties, LLC.' Umpqua rejected that offer.

"While the parties were putting together their offers, plaintiff shared a substantial amount of information with defendant that plaintiff would not have shared absent their agreement to jointly purchase the property. Among other things, plaintiff and defendant discussed plaintiff's bonds. At one point, defendant suggested to plaintiff that they tap

the bonds to pay for the Phase 2 infrastructure and that, 'if the bond company comes after plaintiff, he could file for bankruptcy.' Plaintiff told defendant 'that's not an option for me financially or ethically.' Defendant nonetheless continued to explore the potential use of the bonds, discussing the possibility with his other investment partners, Evans and Kingsley. Defendant wanted the city to enforce the bonds 'to build out infrastructure on Phase 2.' He further recognized that 'it would be very difficult' to accomplish that plan if he remained partners with plaintiff, in light of the fact that the bond company could go after plaintiff for any expenditures it was required to make on the bond.

"In early December 2009, the parties made a second joint offer on the property, proposing to purchase it from the bank for $1.71 million. The parties again submitted the offer through defendant and designated 'Larry Kine Properties, LLC' as the proposed purchaser. The bank countered with an addendum, which lowered the price to $1.6 million, but specified that the property would be sold 'as is' and the deal must close by December 30, 2009. Plaintiff and defendant accepted, agreeing to the terms proposed by the bank.

"*** On December 28, two days before the transaction was scheduled to close, defendant told plaintiff that he and his group were not ready to close the deal and would have to request a 30-day extension. In fact, at that time, defendant intended to terminate his partnership with plaintiff and was working with Evans and Kingsley to purchase the property without plaintiff's involvement, so that defendant could pursue the use of the bonds to pay for the Phase 2 infrastructure. In early January 2010, defendant left a voicemail for plaintiff, requesting that plaintiff provide him more information about the bonds and other details about plaintiff's dealing with the bank, ostensibly for the purpose of 'making the parties' offer back to the bank.' Shortly thereafter, on January 12, 2010, the parties spoke again. At that time, defendant told plaintiff both that he no longer wanted to pursue the transaction with plaintiff and that he was not interested in purchasing the property at all[.]

"*****

"After defendant ended their partnership, plaintiff remained committed to purchasing the property. ***

Meanwhile, defendant, along with Evans and Kingsley, continued to work on their plan to acquire the property and use the bonds to finance the Phase 2 infrastructure. *** [D]efendant made a $1.6 million offer on the property. During the same time period, defendant or his investment partners were exerting pressure on the city to enforce the bonds.

"Shortly after defendant made his offer to purchase the property, plaintiff independently offered to purchase the property, first for $1.1 million and then for $1.25 million. *** Umpqua ultimately agreed to sell the property to defendant for $1.2 million, and the property was purchased in the name of Stonecrest [Properties, LLC]. Defendant's investment group continued to negotiate with the city regarding the enforcement of the bonds to pay for the Phase 2 infrastructure, and defendant's *pro forma* for the project estimated profits based on the assumption that defendant and his partners would be able to obtain 'free infrastructure' by enforcing the bonds.[3]

"* * * * *

"Plaintiff sued defendant for breach of contract ***, [among other claims not relevant to this appeal.] ***

"* * * * *

"At the close of plaintiff's case, defendant moved for a directed verdict on all claims. The trial court granted the motion but submitted the case to the jury pursuant to ORCP 63 B. The jury found in favor of plaintiff on all claims, awarding plaintiff $686,000 on the breach of contract claim ***."

*Vukanovich II*, 268 Or App at 626-32 (brackets from original omitted).

---

[3] To the extent that defendant and his investors believed that they had a legal right to enforce the bond, this was a flawed assumption. In a previous case involving the same failed housing development as here, we held that the subsequent developer was, at most, an incidental beneficiary of the original developer's bonds, which were for the benefit of the city, and therefore the subsequent developer lacked standing to enforce the bond. *Stonecrest Properties, LLC v. City of Eugene*, 280 Or App 550, 382 P3d 539 (2016). In another case involving, yet again, different parties but the same development, the subsequent developer sued the city in an attempt to force the city to enforce the bonds and secure the original developer's obligation. There we held that the city had no statutory or contractual obligation to either complete the improvements or call in the bonds. *LDS Development, LLC v. City of Eugene*, 280 Or App 611, 382 P3d 576 (2016), *rev den*, 361 Or 100 (2017).

In a special verdict form, the jury was asked to find whether plaintiff had fraudulently induced defendant into entering the parties' agreement. The jury answered "no" to the question, "Do you find that [defendant] was induced into entering a contract with [plaintiff] through Plaintiff's knowing or reckless misrepresentations or concealment of material facts known to Plaintiff at the time promises were exchanged to enter into the contract?" After the jury returned its verdict, the trial court granted defendants' motion for judgment notwithstanding the verdict, renewing its rulings on defendants' directed verdict motion. The court also ruled, in the alternative, that the equitable doctrines of unclean hands and equitable estoppel barred plaintiff's recovery on all claims.

Plaintiff appealed, assigning error to, among other things, the trial court's grant of judgment notwithstanding the verdict (JNOV) and its ruling on the equitable defenses. *Id.* at 632. We held that the court erred in granting JNOV on plaintiff's contract claim and that the conduct relied on by the court in its unclean hands and equitable estoppel rulings did not meet the elements of those defenses as a matter of law. Among other reasons, we concluded that the conduct relied on by the court all occurred *after* defendant had breached the contract in December 2009, and that conduct had no legal relevance to plaintiff's breach of contract claim. *Id.* at 640-41. We reversed and remanded to the trial court for entry of judgment reinstating the jury's verdict in favor of plaintiff on the breach of contract claim.

Defendant then petitioned for reconsideration, which we allowed. *Vukanovich III*, 271 Or App at 135. On reconsideration, we were persuaded by defendant's argument that, because the parties agreed to have the equitable defenses decided by the trial court, the trial court should determine in the first instance whether the record contained evidence of conduct before the alleged breach by plaintiff that could support a finding in favor of defendant on the equitable defenses. *Id.* at 136-37. We accordingly withdrew our prior opinion and substituted a new disposition, remanding to the trial court to determine whether any of the remaining conduct on which defendant relied in connection with the formation of, and during the life of, the contract supported a

ruling in favor of defendant on the equitable defenses. *Id.* at 137-38.

On remand, the trial court again ruled for defendant on the equitable defenses of unclean hands and equitable estoppel. The court framed the issue on remand as "whether there was any evidence in the record of the trial held before this Court to justify findings of fact and conclusions of law in favor of [defendant] on either the unclean hands/*in pari delicto* or equitable estoppel affirmative defenses." The court made a number of factual findings, of which the following are relevant to this appeal.

"10) As of September 29, 2009, [defendant] reasonably believed and relied on Plaintiff's representation that the total investment needed to buy the Property and prepare the lots for sale would be $1,840,000.

"* * * * *

"16) The information that Plaintiff knew, and failed to disclose to [defendant], about the true costs to purchase the Property from Umpqua Bank and prepare all the lots for sale, was material to the agreement between [defendant] and Plaintiff, as memorialized by the Letter of Understanding.

"17) Prior to 2009, Plaintiff had purchased bonds for the benefit of the City of Eugene to guarantee performance of certain necessary infrastructure work, which Plaintiff had personally guaranteed. One of the bonds was in the face amount of $1,063,000.

"18) Prior to September 2009, Plaintiff knew that if the necessary infrastructure work was not performed, he could be personally liable to the bonding company for up to $1,063,000, if the bonding company paid to have the infrastructure work completed. Plaintiff knew all of the lots could not be sold without completion of that infrastructure work and approval by the City of Eugene.

"19) As of September 29, 2009, Plaintiff planned to have the City of Eugene release the bonds Plaintiff had previously given, and Plaintiff planned to have the City of Eugene require any new buyers, including any group involving [defendant], provide and personally guarantee new performance bonds.

"20)   Having the City require new bonds to secure or guarantee completion of the infrastructure work, rather than relying on the existing bonds, would burden the new buyers with $1,063,000 that was originally guaranteed by Plaintiffs prior bond.

"21)   As of September 29, 2009, Plaintiff failed and refused to disclose anything to [defendant] about his plans to have the City release his prior bonds and require new bonds and new guarantees by any new buyers of the Property.

"22)   As of September 29, 2009, [defendant] knew nothing about Plaintiff's plans to have the City release his prior bonds and require new bonds and new guarantees by any new buyers of the Property.

"23)   The information that Plaintiff knew, and failed to disclose to [defendant] about Plaintiff's plans regarding his prior bonds was material to the agreement between [defendant] and Plaintiff as memorialized by the Letter of Understanding."

Based on those findings of fact, the trial court found three independent instances of inequitable conduct that occurred prior to defendant's breach that, the court determined, barred plaintiff's recovery under the equitable defenses of unclean hands and equitable estoppel. The court described those three instances of conduct as follows:

"Plaintiff misled, defrauded and/or deceived [defendant] by (1) materially understating the total costs needed to buy the Property and prepare all of the lots for sale; (2) concealing from [defendant] his true plans regarding securing the City of Eugene's release of his prior bonds and, thereafter, having the City require new performance bonds and guarantees; (3) using [defendant] to hide his involvement in the purchase of the Property from Umpqua Bank. Plaintiff conducted himself unethically, unjustly, fraudulently, unfairly and/or in bad faith in his dealings with [defendant] with regard to the Letter of Understanding, the contract between [defendant] and Plaintiff pursuant to which Plaintiff seeks relief."

In other words, the court ruled in favor of defendant on the equitable defenses of unclean hands and equitable estoppel on three independent grounds: (1) plaintiff misrepresented the total cost of preparing all of the lots for sale (costs theory);

(2) plaintiff concealed his true plans regarding the bonds (bonds theory); and (3) plaintiff defrauded the bank by using defendant to conceal his own involvement in the deal. The trial court accordingly entered a judgment in favor of defendant on plaintiff's breach of contract claim.

Plaintiff now appeals from that judgment, raising four assignments of error. As mentioned above, plaintiff first assigns error to the trial court's findings of fact that, in plaintiff's view, contradict the jury's findings of fact. Second, plaintiff assigns error to the court's evidentiary standard when finding the facts; plaintiff argues that the trial court improperly reviewed the record following remand from our court only for "any evidence" to support defendant's equitable defenses, rather than properly considering all of the evidence concerning the prebreach conduct of the parties, to resolve those defenses. Third, plaintiff assigns error to specific factual findings made by the court, arguing that there is not any evidence in the record to support them. Lastly, plaintiff assigns error to the court's legal conclusions on the equitable defenses, arguing that, even if we accept the court's findings as supported by evidence, those findings did not meet the elements of equitable estoppel or unclean hands as a matter of law.

Plaintiff's assignments of error challenge the trial court's rulings on the equitable defenses. Because those defenses are equitable in nature, we have discretion to review *de novo* the court's decision. ORS 19.415(3)(b). However, neither party has requested that we take *de novo* review, and this case does not appear to be an "exceptional case[]" that would warrant doing so. ORAP 5.40(8)(c). Therefore, we review the trial court's legal conclusions for errors of law and its factual findings to determine whether the findings are supported by any evidence in the record. *Vukanovich II*, 268 Or App at 633.

At the outset, it is important to note that the trial court ruled in favor of defendant on both equitable estoppel and unclean hands, and, for each defense, the court based its ruling on multiple theories of inequitable conduct, any one of which, if supported, would be sufficient to affirm the court's ruling in favor of defendant. Because, as explained

below, we affirm the court's ruling on equitable estoppel on the "bonds theory"—that plaintiff failed to disclose to defendant the existence of his prior performance bonds and personal guarantee—we do not address plaintiff's arguments regarding unclean hands. We also do not address plaintiff's arguments regarding the other independent factual bases for the equitable defenses.[4]

## I. TRIAL COURT FINDINGS THAT CONTRADICT THE JURY'S FINDINGS

In plaintiff's first assignment of error, he contends that the trial court erred by making findings of fact that were inconsistent with the jury's factual findings in its special verdict. In our previous opinion on reconsideration, *Vukanovich III*, we noted that a ruling in favor of defendant on remand "would require the trial court to find the facts differently from the jury." 271 Or App at 137. We also noted that it is an unsettled question of law whether and when a court sitting in equity is required to give weight to a jury's findings on a legal claim in the same case. *Id*. at 137 n 5. Because the trial court had yet to make findings regarding the parties' conduct prior to the termination of the contract that related to the equitable defenses, we did not resolve that unsettled question. As noted, the court has now made those findings. At least on the surface, some of the court's findings on defendant's equitable estoppel defense appear to conflict with the jury's findings on plaintiff's claim for fraudulent inducement. However, as we explain below, the jury determined that it could not find by the *higher* clear

---

[4] The dissent contends that the trial court's ruling was based on the cumulative effect of the multiple theories of conduct and that those factual theories were not independent alternative grounds for the court's ruling. *See* 302 Or App at 305 (Sercombe, S. J., concurring in part, dissenting in part). Contrary to the dissent's assertion that the court's conclusions are "framed in the conjunctive, and not in the disjunctive," the text of the court's opinion uses the conjunctive "and" and the disjunctive "or" in various instances, and, as quoted above, uses only semicolons with no conjunction to state its ultimate conclusion. In the broader context of the opinion—including the court's individual factual findings for each element of the equitable estoppel defense, on each factual theory—we think it is more appropriate to view the trial court's rulings on equitable estoppel as independent alternative grounds. Additionally, the nature of the equitable estoppel defense is such that every instance of fraudulent misrepresentation that meets the elements of the defense is an independent ground for denying relief. Accordingly, we view the "costs theory" and the "bonds theory" as independent and alternative grounds for the trial court's ruling in favor of defendant on equitable estoppel.

and convincing evidence standard that plaintiff had made misrepresentations and concealments of material fact to induce defendant to enter into an agreement. The jury's failure to so find does not necessarily conflict with the court's later finding, based on a *lower* preponderance of evidence standard, that plaintiff had induced defendant to enter into the contract through concealments of material fact.

Before we expand on that issue, we first address plaintiff's contention that the trial court erred in making any findings on the equitable affirmative defenses because plaintiff had not agreed to let those defenses be resolved by the court. Plaintiff is incorrect. As we explained in *Vukanovich III*, the parties' "Neutral Statement of the Case" stated that some issues would be decided by the court and some issues would be decided by the jury. *See* 271 Or App at 137 n 4. Although the statement did not clarify which issues would be decided by the court, the otherwise quite-detailed special verdict form and the jury instructions did not include an instruction or question on unclean hands or equitable estoppel, indicating that these issues would not be decided by the jury. More significantly, after the court dismissed the jury, it engaged in a colloquy with the parties about various post-trial matters, and defendant's counsel reminded the court that it needed to rule on the unclean hands and estoppel defenses. Plaintiff's counsel did not object to dismissing the jury, nor to having the court rule on the defenses. As we stated in *Vukanovich III*, "[t]he record indicates that the parties agreed that the equitable defenses would be tried to the court[.]" *Id*. at 137. Therefore, we reject plaintiff's argument. Plaintiff acquiesced to have the equitable defenses decided by the court, and we reject his argument that the court, as a result, erred in making any findings relating to those defenses.

Next, plaintiff argues that, even if he did agree to have the equitable defenses tried to the court, that stipulation violated ORCP 51 C because plaintiff did not formally stipulate in writing or orally on the record. Plaintiff also contends that, by deciding the equitable defenses, the court violated his right to a jury under Article I, section 17, and Article VII, section 3, of the Oregon Constitution. Those arguments are unpreserved. Plaintiff did not raise before

the trial court any argument regarding his right to a jury trial, nor any concern he may have had regarding ORCP 51 C. "Generally, an issue not preserved in the trial court will not be considered on appeal." *State v. Wyatt*, 331 Or 335, 341, 15 P3d 22 (2000); *see also* ORAP 5.45(1) (setting forth requirements for preservation of error). Plaintiff does not ask us to exercise our discretion to review for plain error, and we decline to do so. Accordingly, we reject the above arguments without further discussion.

Finally, we address plaintiff's argument that the trial court could not decide facts relating to the equitable defenses that conflicted with the jury's related findings on the legal defenses. We note, again, that, if defendant prevails on appeal on any equitable defense under any of the three theories resolved by the trial court in defendant's favor, defendant's success on that issue would require us to affirm the trial court. Therefore, because, as explained below, we affirm the trial court's legal conclusions regarding equitable estoppel based on the bonds theory, we have limited our review here to the trial court's conclusion that plaintiff should be equitably estopped from recovering on his breach of contract claim because plaintiff misled defendant by "concealing from [defendant] his true plans regarding securing the City of Eugene's release of his prior bonds and, thereafter, having the City require new performance bonds and guarantees."

The trial court concluded that, before the parties entered into their letter of understanding, plaintiff had concealed from defendant that plaintiff had personally guaranteed performance bonds for the development. As we understand it, the court determined that plaintiff had misled defendant regarding plaintiff's plans to reduce his liability on those personal guarantees by having the new investor group guarantee the new bonds. Those conclusions formed the basis for the court's ruling in favor of defendant on the equitable estoppel defense as it related to the bonds theory. In support of those conclusions, the court found:

> "Plaintiff failed and refused to disclose anything to [defendant] about his plans to have the City release his prior bond and require new bonds and new guarantees by any new buyers of the Property.

"The information that Plaintiff knew, and failed to disclose to [defendant] about Plaintiff's plans regarding his prior bonds was material to the agreement between [defendant] and Plaintiff as memorialized by the Letter of Understanding."

Plaintiff contends that those trial court findings are contradicted by the fact that the jury answered "no" to the following three questions:

"Do you find that [defendant] was induced into entering a contract with [plaintiff] through Plaintiff's knowing or reckless misrepresentations or concealment of material facts known to Plaintiff at the time promises were exchanged to enter into the contract?

"Do you find that [plaintiff] breached the contract by failing to perform or comply with material terms or conditions of the contract?

"Do you find that [plaintiff] breached the implied covenant of good faith and fair dealing in performing the contract?"

We readily reject plaintiff's argument that the jury's latter two findings are contradicted by the trial court's findings regarding equitable estoppel. Although plaintiff asserts that a contradiction exists, plaintiff does not attempt to explain *how* the jury's findings regarding plaintiff's performance of the contract contradict the court's findings. That plaintiff did not breach the contract or the duty of good faith and fair dealing in *performing* the contract is immaterial to whether plaintiff may have *induced* defendant into entering the contract by concealing material information.

We turn to the jury's first finding above that plaintiff did not induce defendant into entering the contract by knowing or reckless misrepresentations or concealments of material fact. On its face, that finding appears to contradict the trial court's later finding that plaintiff misled defendant by concealing plaintiff's plans to replace the existing bonds that he had personally guaranteed with new bonds purchased by the new investor group. However, in the context of the court's instructions on the burden of persuasion, we conclude that the jury's and court's findings are not necessarily in conflict.

The trial court instructed the jury that, for defendant to prevail on the affirmative defense of fraudulent inducement, defendant had to prove by clear and convincing evidence that, among other things, plaintiff, "through his representations or concealment of material facts, intended to induce the Defendant to act or refrain from acting in reliance upon the representations or concealment." By contrast, the court only had to conclude that defendant met his burden to prove the elements of his equitable estoppel defense by a preponderance of the evidence. *Coos County v. State of Oregon*, 303 Or 173, 181, 734 P2d 1348 (1987) ("The facts creating an estoppel must be proved by a preponderance of the evidence.").[5] Thus, the jury could have found that defendant did not meet his burden to prove by the higher clear and convincing evidence standard that plaintiff fraudulently

---

[5] The jury was instructed as follows as it relates to defendant's fraudulent inducement defense:

"In this case, the Defendants must prove their affirmative defenses by a preponderance of the evidence, *but prove their affirmative defense of fraudulent inducement by clear and convincing evidence.*

"* * * * *

"For Defendant Larry Kine to prevail on his affirmative defense of fraudulent inducement or deceit, he must prove all of the following:

"(1) The Plaintiff made a false representation of material fact;

"(2) The Plaintiff knew the factual representation was false or recklessly made the representation without knowing if it was true or false, or concealed from Defendant material factual matters within Plaintiff's knowledge;

"(3) The Plaintiff, through his representations or concealment of material facts, intended to induce the Defendant to act or refrain from acting in reliance upon the representations or concealment;

"(4) The defendant Larry Kine justifiably relied on Plaintiff's representations or concealment of material facts;

"(5) The defendant Larry Kine was damaged as a direct result of his reliance on Plaintiff's representations or concealment of material facts."

(Emphasis added.) Compare that jury instruction with the trial court's articulation of the elements of equitable estoppel:

"The doctrine of estoppel 'preclude[s] a person from asserting a right to recovery that the person otherwise would have had if (1) the person, through conduct or statements, makes a false representation; (2) the party making the representation has knowledge of the true facts; (3) the other party is unaware of the true facts; (4) the party making the representation intended for the other party to rely on it; and (5) the other party was induced to act upon the false representation."

(Quoting *Vukanovich II*, 268 Or App at 639.) Equitable estoppel must be proved by a preponderance of the evidence. ORS 10.095(5); *Coos County*, 303 Or at 181.

induced defendant into entering the contract by concealing information regarding the bonds. At the same time, the trial court could still find that defendant met his burden of proof to show by a preponderance of the evidence that plaintiff should be equitably estopped from enforcing the contract for inducing defendant to act through a concealment of material facts.[6] Those findings, at least in the context of the instructions given in this case, do not necessarily conflict.[7] Because of that, we do not reach plaintiff's argument that the court "erred in making findings inconsistent with the jury verdict" and do not discuss the unsettled questions of law that we acknowledged in *Vukanovich III*. In sum, based on the analysis above, we reject plaintiff's first assignment of error.

## II.   EVIDENTIARY STANDARD ON REMAND

Plaintiff next assigns error to the trial court's ruling in favor of defendant on the equitable defenses. He contends that the court used an incorrect evidentiary standard when finding the facts. In its order, the court stated that "the one remaining question this Court must determine is whether there was *any evidence* in the record of the trial held before this Court to justify findings of fact and conclusions of law in favor of [defendant]" on the equitable defenses. (Emphasis added.) Plaintiff asserts that the court mistakenly applied an "any evidence" standard, which is the standard by which an appellate court typically reviews a trial court's factual findings on appeal. Plaintiff asserts that the task of the trial court on remand was to determine whether defendant's allegations of prebreach conduct by plaintiff were credible

---

[6] The parties do not address what duty, if any, plaintiff had to disclose the information regarding his personal guarantee of the bonds. Under the doctrine of equitable estoppel, "a person may be precluded by his act or conduct, or silence when it was his duty to speak, from asserting a right which he otherwise would have had." *Day v. Advanced M&D Sales, Inc.*, 336 Or 511, 518, 86 P3d 678 (2004) (internal quotation marks and citation omitted). We therefore express no opinion on that issue.

[7] We again note that plaintiff at least acquiesced to let the trial court decide the affirmative defenses of equitable estoppel and unclean hands and did not insist that the jury had to decide those issues. To the extent that plaintiff might now contend that those issues should have been decided by the jury after all or decided based on the same standard of proof, plaintiff did not timely raise that argument in the trial court.

and then determine whether such evidence supported the asserted equitable defenses.[8]

We disagree with plaintiff that the trial court only considered whether any evidence supported the asserted defenses. Although the court used the words "any evidence" in its written decision, there is no other indication that the court did anything other than view the evidence in the manner that the plaintiff asserts that it should have. Therefore, we reject plaintiff's second assignment of error.

## III.   EQUITABLE DEFENSES

We address plaintiff's third and fourth assignments of error together because of the interrelated nature of plaintiff's arguments. In his third and fourth assignments of error, plaintiff contends that the trial court erred in ruling for defendant on the equitable defenses because the rulings are not supported by the evidence or law. Plaintiff argues that there was no evidence to support the court's factual findings. Plaintiff further argues that, even if we accept the court's factual findings, those facts as found by the court do not meet the standards for equitable estoppel and unclean hands as a legal matter. As noted throughout this opinion, we limit our analysis to the trial court's ruling in favor of defendant on his equitable estoppel defense arising from defendant's "bonds theory."

### A.   *Findings of Fact Related to the Bonds*

In his third assignment of error, plaintiff contends that there was no evidence in the record to support the trial court's factual finding that plaintiff's nondisclosure of the prior performance bonds was material to the agreement. The court stated:

> "The information that Plaintiff knew, and failed to disclose to Kine about Plaintiff's plans regarding his prior

---

[8] Although neither party has asserted the standard for the equitable defenses at issue, we note, as previously explained, that the applicable standard of proof for defendant's unclean hands and estoppel defenses is by a preponderance of the evidence. ORS 10.095(5) ("[I]n civil cases the affirmative of the issue shall be proved, and when the evidence is contradictory, the finding shall be according to the preponderance of evidence[.]"); *Coos County*, 303 Or at 181 ("The facts creating an estoppel must be proved by a preponderance of the evidence.").

bonds was material to the agreement between Kine and Plaintiff as memorialized by the Letter of Understanding."

Plaintiff does not cite any law regarding the legal standard of materiality for an omission of fact in the context of an equitable estoppel defense. Plaintiff focuses on defendant's testimony and contends that any undisclosed facts regarding the bonds were simply not material *to defendant* either when entering the agreement or proceeding with the agreement immediately afterward. We understand plaintiff to contend that the bonds were not material to the agreement because they were not subjectively important *to defendant* as a factual matter.

We turn to the elements of equitable estoppel and the requirement of materiality. As we explained in *Vukanovich II*,

"[equitable estoppel] can preclude a person from asserting a right to recovery that the person otherwise would have had if (1) the person, through conduct or statements, makes a false representation; (2) the party making the representation has knowledge of the true facts; (3) the other party is unaware of the true facts; (4) the party making the representation intended for the other party to rely on it; and (5) the other party was induced to act upon the false representation."

268 Or App at 639 (citing *Day v. Advanced M&D Sales, Inc.*, 336 Or 511, 518-19, 86 P3d 678 (2004)). "For equitable estoppel to apply, the false representation must be one of existing material fact." *Day*, 336 Or at 519 (internal citation and quotation marks omitted).

Determinations of materiality are "generally committed to the trier of fact." *OPERB v. Simat, Helliesen & Eichner*, 191 Or App 408, 436, 83 P3d 350 (2004), *rev withdrawn*, 340 Or 411 (2006). Materiality may be resolved as a matter of law "only when reasonable persons could not differ as to the importance of the omissions or misrepresentations." *Everts v. Holtmann*, 64 Or App 145, 152-53, 667 P2d 1028, *rev den*, 296 Or 120 (1983).

We observe two problems that arise from plaintiff's argument that the undisclosed information was immaterial to the agreement because it was immaterial to defendant.

First, cases in the common law fraud context, which are instructive here, provide that materiality is based on whether the information "would be likely to affect the conduct of a reasonable man with reference to a transaction with another person." *Millikin v. Green*, 283 Or 283, 285, 583 P2d 548 (1978); *see also Pape' v. Knoll*, 69 Or App 372, 379, 687 P2d 1087, *rev den*, 298 Or 150 (1984) (stating same).[9] The operative test is based on whether the conduct of an objectively reasonable person would have been affected by the omitted information. Second, assuming that defendant's subjective intent is relevant to the issue of the materiality of the undisclosed information, there was evidence from which the trial court could find that the undisclosed information regarding the performance bonds was material to defendant.

Applying an objective test, we cannot say as a matter of law that reasonable factfinders could not differ as to whether the undisclosed information was material. In other words, a reasonable factfinder could find that plaintiff's nondisclosure of the performance bond prior to the parties' agreement was a material omission. A reasonable factfinder could find, as the trial court did, that a reasonable investor in defendant's position would want to know if his partner in a $1.8 million property transaction had an undisclosed performance bond liability and a personal guarantee to ensure the development's infrastructure was completed on the property, which gave his partner a possible vested interest in ensuring that the property development was completed with new investors.[10] That is, a reasonable factfinder could determine that (1) plaintiff had an incentive to ensure that the infrastructure on the property was completed to eliminate plaintiff's risk on the prior bond and his personal

---

[9]  Plaintiff frames his argument as one of materiality and does not frame his argument as one involving the element of reliance. We do not address the element of reliance because it has not been argued to us. The question of whether a party has to prove "reliance" on material information that is *not* disclosed to the party and, if so, how to prove such reliance on the omitted information presents difficult issues of law that may depend on the particular claim and facts of each case. Those issues have not been briefed before us.

[10] We note that neither plaintiff nor defendant presented any expert testimony or other evidence regarding the standards for disclosure and investment in the commercial real estate industry.

guarantee; (2) plaintiff wanted to replace and spread the risk of that liability among a number of new investors; and (3) plaintiff's undisclosed performance bond and personal guarantee would have been material to defendant had he been aware of it before the parties' agreement.

Second, even assuming that defendant's subjective belief is relevant to the issue of materiality, a reasonable factfinder could find, as the trial court did, that the omitted information was material *to defendant*.[11] Regarding the bonds, defendant testified:

> "So, I mean, the information he gave to me is—some of it is accurate and some of it is absolutely incorrect. For example, let me go into that a little bit further. The bonds are self-serving. He never disclosed to me that he has personally guaranteed those, that he has those, and what's going on with them. He's just telling me they're going to need to be replaced. That's the city's position. He has a completely different interest in the property than the other investors would have in there. He's saying that we'd have to go in there and pay for all this infrastructure that he guaranteed while he was developing the property to the tune of two and a half million dollars. His interests are clearly different than ours."

Defendant's testimony was given in the context of explaining why he decided to proceed on his own and not continue with plaintiff as part of the original agreement. A factfinder could draw a reasonable inference that defendant would not have entered into the agreement with plaintiff had he known of (1) the existence of plaintiff's prior performance bonds and (2) plaintiff's undisclosed interest in ensuring that the project move forward to relieve plaintiff of personal liability for the failure to complete the development's infrastructure. Based on the testimony above, the trial court could properly

---

[11]  We note that, although *Millikin* stated that the test for materiality was an objective reasonable-person test, the court then immediately stated that, "[i]n addition, plaintiffs testified that they would not have purchased the dwelling had they known [of the undisclosed information regarding the need for a new roof]." 283 Or at 285. The court in *Millikin* at least considered the subjective understanding of the defrauded party as additional significant information following its statement of the objective test. As we note, we do not need to decide whether the claimed defrauded party's subjective understanding is relevant because, even assuming that it is, there was evidence from which the trial court could conclude that the undisclosed information was material to defendant.

find that the undisclosed performance bonds were subjectively material to defendant when entering the agreement.

Plaintiff points to contrary evidence and inferences that defendant initially appeared willing to move forward with their agreement even after learning more about the bonds. Plaintiff also points to defendant's lack of due diligence regarding the property before the parties' agreement. In doing so, plaintiff asks us to reweigh the evidence. A reasonable factfinder could have found that defendant failed to do his own due diligence and was initially unconcerned about the bonds, but the trial court did not have to credit that evidence. Based on our standard of review, the issue before us is whether there was *any* evidence to support the court's factual finding. *See Vukanovich II*, 268 Or App at 633 (stating standard of review). There was, and we therefore reject plaintiff's argument.

The dissent capably explains why, in its view, the trial court erred in concluding that plaintiff Vukanovich's guarantee of the bonds that secured the Phase 2 improvements was immaterial to defendant as an issue of fact and law. The dissent relies heavily upon legal authorities, including the City of Eugene's development code, and arguments that were not raised in plaintiff's briefs. *See, e.g.*, 302 Or App at 301 (Sercombe, S. J., concurring in part, dissenting in part) (explaining that, under the city code, a new owner would be "bound, either as a successor-in-interest to the original performance agreement or under a new performance agreement with the city"). We might not reach the same conclusions that we reach here, were we to decide this case *de novo* or based on different legal arguments than the ones presented to us.

The dissent contends that there are no facts to support the trial court's conclusion that plaintiff failed to disclose his plan to have new investors provide new guarantees to supplant his liability on the prior performance bonds for Phase 2 of the development. *Id*. at 298-99 (Sercombe, S. J., concurring in part, dissenting in part). The dissent points to references in the parties' letter of understanding that at least reference "costs associated with Bonding" of $90,000. However, as discussed above, the trial court could credit

defendant's testimony that plaintiff did not disclose plaintiff Vukanovich's personal guarantee of the Phase 2 performance bonds, and it did not have to conclude that the disclosure of bonding costs revealed the nature of plaintiff's prior bonds and guarantees, if any.

The dissent also contends that there was no evidence that plaintiff could compel the city to require a substitute Phase 2 performance bond. *Id*. at 299 (Sercombe, S. J., concurring in part, dissenting in part). That is true. We do not read the trial court's conclusions and findings so narrowly to conclude that plaintiff had any control over the city, but that plaintiff did not disclose its desire to have the new developers replace plaintiff's then-sole liability to complete the infrastructure with a new bond that reduced or eliminated plaintiff's liability.

The dissent also correctly notes that, after the parties entered into the letter of understanding, defendant tried to take advantage of plaintiff's existing bond rather than immediately seek to leave their joint project. *See generally id*. at 300-03 (Sercombe, S. J., concurring in part, dissenting in part). The fact that a party, after entering into an agreement, may seek to use new information to its advantage does not foreclose the possibility that that party may have chosen not to enter into the agreement had it had that information beforehand. In any event, as discussed above, the trial court could credit defendant's testimony quoted above regarding plaintiff's guarantee of the Phase 2 performance bonds and then conclude that the undisclosed information was material to defendant. The dissent also notes that "the law of estoppel does not preclude enforcement of a contract when either party fails to disclose their personal intentions prior to the formation of the contract." *Id*. at 300 n 7 (Sercombe, S. J., concurring in part, dissenting in part). We agree, but, as we note above, plaintiff did not argue to us that plaintiff had no legal duty to disclose information about plaintiff's prior bonds.

For all of the reasons explained above, we conclude that the trial court did not err in finding that plaintiff failed to disclose information material to defendant before the parties entered into the letter of understanding.

B. *Legal Conclusion on Equitable Estoppel Based on Bonds*

Plaintiff lastly assigns error to the trial court's legal conclusion, arguing that, even if we accept the court's factual findings as supported by evidence, those findings do not support a legal conclusion in favor of defendant on equitable estoppel. As to the court's equitable estoppel ruling on the "bonds theory," plaintiff's primary argument is that plaintiff's failure to disclose the existence of the prior performance bonds is "not the stuff of estoppel." Plaintiff cites no law and develops no further legal argument in support of his assertion that these facts cannot give rise to equitable estoppel as a matter of law. It is not "our proper function to make or develop a party's argument when that party has not endeavored to do so itself." *Beall Transport Equipment Co. v. Southern Pacific*, 186 Or App 696, 700 n 2, 64 P3d 1193, *adh'd to as clarified on recons*, 187 Or App 472, 68 P3d 259 (2003). Consequently, without a developed argument from plaintiff to support his claim of error, we will not reverse the trial court's conclusion as to the bonds theory.

Plaintiff further argues that "[e]quitable defenses are supposed to create fairness in situations where there would otherwise be none. When a party has corrected his misrepresentations very soon after an agreement is made and prior to anyone putting money and time into the deal, there is nothing for equity to remedy." Plaintiff again cites no law in support of his proposition. Defendant raised equitable estoppel as a defense to plaintiff's claim that defendant breached the September 29 agreement. Even assuming that plaintiff *later* disclosed material information that was not shared before the agreement, a court could conclude, after having found that the elements of equitable estoppel are met, that equity would permit defendant to raise the defense to prevent enforcement of an agreement that defendant entered into without prior knowledge of the material information. As a result, we reject plaintiff's fourth assignment of error and affirm the trial court's ruling.

IV.   CONCLUSION

The trial court did not make factual findings regarding defendant's equitable estoppel defense that were inconsistent with the jury's findings regarding defendant's

fraudulent inducement defense. In light of the different burdens of persuasion applied by the trial court and the jury on those defenses, the findings were not necessarily in conflict. The court also did not err in the evidentiary standard that it employed to review the record. Evidence in the record supports the court's factual finding that plaintiff's omission of the prior performance bonds and his personal guarantee of those bonds was material to defendant. Lastly, the court did not err in its legal conclusion in favor of defendant on equitable estoppel on the theory that plaintiff failed to disclose the existence of his prior performance bonds to defendant. That ruling by the court was sufficient to enter judgment in favor of defendant. Accordingly, we affirm.

Affirmed.

**SERCOMBE, S. J.,** concurring in part, dissenting in part.

I disagree with the majority's conclusion that "reasonable factfinders could *** differ as to whether ['[p]laintiff's plans regarding his prior bonds'] [were] material" to the "agreement between [defendant] and [p]laintiff] as memorialized by the Letter of Understanding." 302 Or App at 273, 283 (inserting the trial court's descriptions into the majority's conclusion).[1] In my view, there was no evidence to support the trial court's conclusion that plaintiff planned to do anything with his bonds—other than to allow them to remain in effect as legally necessary. The disclosure of the normal role that bonds play in the development of a subdivision would not be regarded as material to an experienced subdivider, like defendant, seeking to form a development

---

[1] The majority and the trial court use the term "plaintiff" to refer to plaintiff personally, as well as to plaintiff's development company, the Real Estate Development Group, LLC (REDG). Plaintiff was the sole member of REDG. REDG was the owner of the subdivision property, the borrower of the bank loans, the initial trustor on the trust deed (although the trust deed was modified to reflect a half ownership by Reid Company), the party to the construction contract, the principal on the bonds with Developers Surety and Indemnity Company (DSIC), the party, with Reid Company, whose interests in the property were foreclosed by the bank, the applicant for subdivision approval, and the party to the performance agreement with the city. Plaintiff's individual role in those arrangements was to guarantee REDG's performance that was secured by the bonds. Otherwise, it was REDG's obligation to construct the improvements that were secured by the bonds. In this dissent, I distinguish between plaintiff personally and REDG.

partnership to complete a subdivision. Many of the findings made by the trial court to justify its conclusion on the materiality of the nondisclosure of plaintiff's bond plan lack any evidentiary support in the record. Some of the other findings and the trial court's materiality conclusion were based on a misunderstanding of applicable law. That misunderstanding was corrected in contemporaneous litigation involving defendant's successor, the city, and the issuer of the bond in question. *Stonecrest Properties, LLC v. City of Eugene*, 280 Or App 550, 382 P3d 539 (2016). I also conclude that there is some evidence to support the trial court's particular findings that defendant justifiably relied on plaintiff's material representations of the "total investment" in the letter of understanding (LOU). But because the trial court erred in concluding that equitable relief was appropriate based on the "bonds theory," the question remains whether the trial court should grant relief on the basis of the "costs theory" alone. In my view, this court should reverse the judgment under review and remand it to the trial court for further proceedings.

We review the trial court's findings of fact, conclusions of law, and order incorporated in the judgment on review for "any evidence to support the trial court's findings and, if such evidence exists, we determine whether the court's findings support [its] conclusion." *OEA v. Oregon Taxpayers United*, 253 Or App 288, 303, 291 P3d 202 (2012); *see also Emerson v. Kusano*, 260 Or App 577, 581, 320 P3d 610 (2014) ("We therefore review the trial court's legal conclusions for errors of law and are bound by the trial court's factual findings if they are supported by any evidence in the record.").

To evaluate the evidentiary sufficiency of the trial court's findings, the majority's recitation of the facts requires supplement. As noted, in 2005, REDG secured an interest in the subdivision property and began the process of designing a subdivision plan. REDG sought subdivision approval from the city. The city required that the subdivision application be made by the owner of the property and that the resulting approvals and permits be binding on that owner.[2]

---

[2] The City of Eugene's development code, Eugene Code (EC) chapter 9, provides that land use applications, including subdivision approvals, be made by the property owner of the affected land. EC 9.7010 ("Applications shall be submitted

In 2007, REDG completed its purchase of the property and obtained purchase and construction financing from Umpqua Bank. The city approved the subdivision. As part of that approval, REDG entered into a performance agreement with the city to implement the conditions of the subdivision approval, including construction of improvements to the subdivision, and executed bonds to secure that improvements obligation.

The city requires a performance agreement between the city and the owner/applicant to contractually obligate the owner to complete the conditions of approval for the application. EC 9.7025(1)(f) provides, "The city shall require execution of a performance agreement by the applicant for *** [s]ubdivisions final plat and any modifications." That agreement is enforceable against the owner or any successor-in-interest to that owner. Under EC 9.7025(7),

> "[i]f an applicant *or an applicant's successor in interest* violates or fails to comply with any of the provisions of the performance agreement or final approved plan, the city may invoke the enforcement procedures provided in the performance agreement, or under applicable law, or both."

(Emphasis added.)

ORS 92.025(1) requires that the final plat of a subdivision be accepted by the governing entity and recorded before any lots can be sold. The city requires that before the final subdivision plat can be accepted, the property owner must file engineered plans for the subdivision improvement with the city engineer and obtain a public improvement permit for the project. EC 7.140. If a successor property owner sought to continue construction of the improvements, that new property owner would need to obtain a public improvement project for that construction. The engineered plans inform the content of the final plat. The city must accept the improvements before lots can be sold.

---

on a form approved by the city manager, be accompanied by a fee established pursuant to EC Chapter 2, and be signed by the property owner[.]"). EC 9.0500 defines "owner" to be "[a]n individual, association, partnership, or corporation having legal or equitable title to land other than legal title held only for purpose of security." That requirement parallels state law, which requires that a subdivision application be submitted by "the person proposing the subdivision *** or authorized agent or representative of the person." ORS 92.040(1).

EC 7.145(1) provides that, prior to commencing construction of any public improvement, "a person shall file with the city engineer a good and sufficient bond in an amount equal to the estimated cost of the improvement." REDG obtained a bond from Developers Surety and Indemnity Company (DSIC). The bond issued in the amount of $1,063,880 to assure completion of the public improvements in the second, 62-lot phase of the subdivision, that were specified in the performance agreement and required by a public improvement permit issued to REDG. We explained the operation of that bond in *Stonecrest Properties, LLC*:

> "REDG obtained a bond from DSIC in the amount of $1,063,880 to secure its obligations under the development agreement. The bond listed REDG as principal, DSIC as surety, and the city as obligee, and provided that it would become 'void' if REDG installed the improvements as specified in the agreement. Otherwise, the bond would 'remain in full force and effect' and DSIC would be 'held and firmly bound unto the City of Eugene as [o]bligee.'"

280 Or App at 553.

After the plat approval, execution of the performance agreement, and issuance of the public improvement permit, plaintiff constructed most of the improvements to the first phase of the subdivision and some of the improvements to the second phase. The real estate crash in 2008 prevented purchasers from obtaining financing for the construction of homes on the lots, the lots did not sell, and REDG defaulted on its purchase money/construction financing loan. The bank began to foreclose on the trust deed in early 2009.

In the summer of 2009, defendant was interested in acquiring a few lots in the approved subdivision in order to develop those lots with homes and sell the improved lots to buyers. The bank, however, was not interested in releasing the lots from its secured interest in the property, preferring instead to foreclose on the property, and resell the entire property based on its value as an approved and partially constructed subdivision.

Defendant and his potential investors investigated the conditions of the property and its legal status, and

discussed with the bank its interest in disposing of the property. Following that investigation, defendant and his investors became interested in purchasing the property from the bank. On September 8, 2009—prior to any discussions with plaintiff about a joint purchase—defendant's development company presented an earnest money agreement to the bank. The earnest money agreement provided that:

> "Buyers agree to purchase the Property from Seller and Seller agrees to sell the Property to Buyers for $1,430,000 ($28,000 x 40 finished lots = $1,120,000 and $5,000 x 62 unfinished lots = $310,000) payable as described below."

Defendant was interested in purchasing the property in a condition where the 40 lots were "finished," that is, where all further improvements and permissions were obtained to allow those lots to be sold. At that time, the city had not yet accepted the improvements to Phase 1. Defendant was aware of that status and that the property was being improved in two phases. A contingency of closing was that,

> "City of Eugene final plat approval for phase 1 (40 lots), all costs to obtain approval will be the responsibility of the seller. Buyer will help with getting this approved from the City if the seller would like the Buyer to take the lead."

Defendant calculated the investment value or purchase price to be $1,430,000.

Defendant testified that his practice in purchasing an incomplete development through an earnest money contract was to make an offer on the property and then investigate the costs to complete the development to see if his assumptions about those costs were accurate:

> "My typical MO when I buy a piece of property is, you never—why go waste your time and effort and energy to go investigate every single detail of what's going on with it with the land use approvals, with what the punch list items are on the streets, with all those types of things if you don't even have a deal to do. You know, you look at it. You look at the general things and say, okay, I can purchase it for this amount of money. And then you go find out if the assumptions that you were making are correct or not. And so that's where I was at with this, too."

The bank rejected defendant's purchase offer, explaining that the offer was too low, and that the bank was interested in disposing of the property for at least $2,000,000.

Plaintiff was preparing his own offer to purchase the property. When defendant became aware of plaintiff's intent, defendant met with plaintiff to discuss combining forces. The parties decided to jointly purchase the property. Plaintiff summarized that meeting in a follow-up email to defendant:

> "I believe we're both on the same page and I look forward to us purchasing the property. I thought it would be a good idea to put our general understanding on paper. I also want to make sure that neither of us accidentally create more competition by having discussions with potential outside investors who may just take a run at the property without us."

Defendant testified that he became interested in purchasing the property with plaintiff because,

> "I don't know that we stayed in constant contact. I know that we—that we probably—we got back—hooked together, you know, when he was trying to buy it and we were trying to go buy it—or *I'm trying to investigate buying it and they're trying to go buy it.* And we're like, maybe we should go work together so that we don't have competing and the bank thinks they have something that's more valuable than, you know, they might otherwise if there's two people competing for it."

(Emphasis added.)

The parties entered into a partnership to those ends. The LOU agreement provided that:

> "Larry Kine and Mark Vukanovich are working in conjunction to purchase property in Eugene, Oregon, known as Moon Mountain Subdivision from Umpqua Bank.

> "Mark Vukanovich is the original developer of the project and has signed a deed in lieu to Umpqua Bank * * * said deed is in the process of being recorded.

> "Larry and Mark are responsible for bringing in 50% of the dollars needed to purchase the property from Umpqua

Bank including costs associated with Bonding, Erosion Control and City Fees. It is anticipated that the land will be purchased for $1,750,000 and the associated costs will be $90,000 for a total investment of $1,840,000.

"Profits will be split 50% to Larry's group and 50% to Mark's group. A new LLC will be formed as the purchaser of the property.

"Mark and Larry will be equally responsible for management and decisions made. Larry will focus more on lot sales and any home construction activity and Mark will focus more on the land development issues."

(Ellipsis in original.) The LOU did not disclose all of the costs to develop the property, only the costs of purchasing the property and "the associated costs" of the city accepting the public improvements for the finished lots so that they could be sold.

Shortly after execution of the LOU, defendant began to prepare an earnest money contract to present to the bank on behalf of the partnership. On October 8, plaintiff emailed defendant a "list of items that I believe will be beneficial to identify to [the bank] as we(you) negotiate the purchase." The list included a breakdown of the "associated costs" of "Bonding, Erosion Control and City Fees" that were represented in the LOU as necessary for city acceptance of the Phase 1 public improvement:

"New bonds will need to be submitted to the City for Phase 1 warranty period and Phase 2 Performance. The City will not let the old bonds stay in place with a new owner. This is a $50k costs at the minimum. Bonds are getting ever more difficult to receive and thus pricing is going up."

The email further disclosed that "City Fees of approximately $15,000 will need to be paid, erosion control of an approximate cost of $15,000 will need to occur," and that there might be additional costs to pay for city acceptance of the improvements. The email also noted additional costs to prepare the Phase 1 lots for sale and to redo the rough grading of the streets in Phase 2. It did not discuss the costs of constructing the public improvements in Phase 2 of the subdivision. The email finally provided that the costs to complete and warrant the Phase 1 improvements were

"associated with the fact that the developer is no longer involved and we would have to redo/resubmit those things previously completed."

Defendant reformatted the email and sent it to the bank with a new earnest money agreement made on behalf of the partnership, but in the name of defendant's development company. The October 29, 2009 earnest money agreement was structured in the same way as defendant's earlier offer, as an offer based on the partial improvement of the subdivision. It extended an offer to purchase the property for "$1,510,000 ($30,000 x 40 finished lots = $1,200,000 and $5,000 x 62 unfinished lots = $310,000) payable as described below." That offer was $80,000 more than the September offer, reflecting an additional $2,000 offer for each of the finished lots. The offer retained the contingency that the bank was to pay any additional costs for city acceptance of the Phase 1 public improvements. The bank initially responded that it wanted to meet with the city to determine what those costs would be.

During the due diligence on the October 29 offer, defendant decided to attempt to tap the bond for the Phase 2 infrastructure.[3] As noted by the majority, defendant wanted the city to enforce the bond. He concluded that "'[i]t would be very difficult' to accomplish that plan if he remained partners with plaintiff." 302 Or App at 269. Defendant decided to present a substitute offer to the bank.

On December 9, defendant presented an offer for $1,710,000, on behalf of the partnership, structured in the same way as the earlier offers, with the purchase price based

_____

[3] At that time, both bonds—the one for REDG's construction of the Phase 1 infrastructure that was nearly completed and ready for city acceptance and the one at issue in this case insuring REDG's obligation to build the Phase 2 infrastructure—remained in effect. Plaintiff had continued paying premiums on the first bond because it continued to insure the remaining costs associated with the Phase 1 improvements and plaintiff's obligations to the construction contractor who had constructed those improvements. The city wanted that bond to remain in effect to insure those obligations. Plaintiff's obligations under that bond are not at issue in this case, and plaintiff and the city did not intend to have a property purchaser replace the existing warranty on those improvements. Plaintiff allowed the second bond on Phase 2 to remain in effect during the time he pursued repurchasing the property because that bond, if transferred, could insure the obligations of the new owners of the subdivision.

on the improved value of Phase 1 and the unimproved value of Phase 2 ("$35,000 x 40 finished lots = $1,200,000 and $5,000 x 62 unfinished lots = $310,000"). As the majority notes, the bank countered with an addendum, "which lowered the price to $1.6 million, but specified that the property would be sold 'as is' and the deal must close by December 30, 2009." *Id*.

Defendant requested a 30-day extension of the closing date on December 28, 2009, but later terminated the partnership with plaintiff and pursued offers to the bank on behalf of different principals. Defendant became aware in late January 2010 of the specifics of the Phase 2 performance bond. On February 19, 2010, defendant offered to purchase the property from the bank contingent upon:

> "Buyer to reach an agreement with the City of Eugene regarding the acceptance of the improvements for Phase I. Buyer to reach an agreement with the City of Eugene as to the status of the performance bond for Phase II. Seller to work fully with Buyer in Buyer's efforts to reach said agreements."

Defendant pursued negotiations with the bank and the city to allow that bond to remain in effect and excuse defendant's obligations to bond construction of the remaining improvements. The city proposed to assign its interest in the bond to defendant to "try to collect on and [then] have a cash deposit in place before [defendant proceeded to obtain the development permit for the improvements under EC 7.140]." Defendant was reluctant to do so because "this is at a minimum a legal expense to pursue the Bond with a maximum exposure of needing to replace the Bond for $1,063,000." On March 18, 2010, the parties signed an addendum to the earnest money agreement removing the bond contingency and lowering the purchase price to $1.2 million. On March 26, 2010, the property was conveyed by the bank to Stonecrest Properties LLC.

The trial court, on remand, entered the following findings with respect to the materiality of plaintiff's nondisclosure of "his true plans regarding securing the City of Eugene's release of his prior bonds and, thereafter, having the City require new performance bonds and guarantees[:]"

"17)   Prior to 2009, Plaintiff had purchased bonds for the benefit of the City of Eugene to guarantee performance of certain necessary infrastructure work, which Plaintiff had personally guaranteed. One of the bonds was in the face amount of $1,063,000.

"18)   Prior to September 2009, Plaintiff knew that if the necessary infrastructure work was not performed, he could be personally liable to the bonding company for up to $1,063,000, if the bonding company paid to have the infrastructure work completed. Plaintiff knew all of the lots could not be sold without completion of that infrastructure work and approval by the City of Eugene.

"19)   As of September 29, 2009, Plaintiff planned to have the City of Eugene release the bonds Plaintiff had previously given, and Plaintiff planned to have the City of Eugene require any new buyers, including any group involving [defendant], provide and personally guarantee new performance bonds.

"20)   Having the City require new bonds to secure or guarantee completion of the infrastructure work, rather than relying on the existing bonds, would burden the new buyers with $1,063,000 that was originally guaranteed by Plaintiff's prior bond.

"21)   As of September 29, 2009, Plaintiff failed and refused to disclose anything to [defendant] about his plans to have the City release his prior bonds and require new bonds and new guarantees by any new buyers of the Property.

"22)   As of September 29, 2009, [defendant] knew nothing about Plaintiff's plans to have the City release his prior bonds and require new bonds and new guarantees by any new buyers of the Property.

"23)   The information that Plaintiff knew, and failed to disclose to [defendant] about Plaintiff's plans regarding his prior bonds was material to the agreement between [defendant] and Plaintiff as memorialized by the Letter of Understanding."

From these facts, the trial court reasoned that the plaintiff's nondisclosure of "his true plans regarding securing the City of Eugene's release of his prior bonds and, thereafter, having the City require new performance bonds" and

his plans to "shift the infrastructure costs to the new buyers by having the City of Eugene require new performance bonds and guarantees and releasing Plaintiff from his prior bonds and guarantees" was "false," and that the false nondisclosure was material to defendant's decision to enter the LOU.

On appeal, plaintiff argues that "there is no evidence that the matter of the bonds was material to the [LOU]." More generally, plaintiff claims that there was "no evidence to support" the trial court's "findings concerning *** concealment of information about plans not to use the existing bonds." I agree that any concealment of the "matter of the bonds" was not material to the decision to enter into the LOU and that many of the supporting findings about plaintiff's secret plan to avoid personal liability and the city's release of the bonds lack any evidentiary support or rest on a misunderstanding of law.[4]

First, findings 21 and 22—that, as of the date of the execution of the LOU, plaintiff "refused to disclose anything to [defendant]" and that defendant "knew nothing about [p]laintiff's plans to have the City *** require new bonds *** by any new buyers of the [subdivision]"—lack any evidentiary support. The LOU, signed by defendant, plainly discloses that costs associated with the purchase and development will need to be incurred by the partnership. It discloses that the "costs associated with Bonding *** [will be part of those] associated costs [of] $90,000."[5]

Second, in findings 19 to 23, the trial court found that plaintiff had a common plan for both performance bonds—to have the city release plaintiff as a principal on both bonds and to require a new purchaser to purchase

---

[4] The majority asserts that my references to the text of the bonds, controlling provisions of the Eugene Code, and subsequent cases interpreting the bonds at issue are inappropriate to consider in evaluating the trial court's factual findings on materiality, concealment, and release because they are "different legal arguments than the ones presented to us." 302 Or App at 285. In my view, plaintiff's arguments about the effect of the bonds were sufficiently developed on appeal to allow a reviewing court to evaluate their legal effect.

[5] I agree with the majority that disclosure of the need for new bonds does not disclose plaintiff's guarantee of the old bonds. 302 Or App at 285. Findings 21 and 22, however, go to the need for new bonds and the trial court's conclusion that this particular nondisclosure was material and false.

substitute bonds. There is no evidence to support the trial court's conclusion about release of the Phase 1 bond. The evidence was that plaintiff paid premiums to continue the Phase 1 bond in 2009. The city required that the Phase 1 bond continue to apply to completion of those improvements and warranting their condition for one year. That is what the bond insured. There is no evidence that, prior to the LOU, the city or plaintiff intended that defendant contract for a replacement bond for Phase 1.

Moreover, there is no evidence that plaintiff didn't intend to continue the Phase 2 bond prior to the LOU, during the time he was attempting to repurchase the subdivision. Plaintiff paid premiums to continue that bond in 2009. Had REDG reacquired the property with defendant, the bond would continue to insure whatever obligation REDG had to construct the improvement as a property owner under the original performance agreement. There would be no need for the bond to be discontinued with the consent of the city. It was only when defendant undertook to purchase the property *without REDG* that plaintiff planned to discontinue the Phase 2 bond with the consent of the city because there would be no improvements by REDG to insure.

There was no issue of fact about plaintiff's intended use of the bonds at the time of the LOU. After the termination of the LOU, the parties differed, however, on the legal effect of the Phase 2 bond. Defendant believed that it could be used to compel REDG to bear 100% of the cost of constructing the Phase 2 improvements application and that plaintiff would be personally liable for that cost as a result of his guarantee of the bond.

The trial court's implicit conclusions about that effect—whether or not plaintiff planned for it—were wrong as a matter of law, as discussed below. That misunderstanding corrupts the trial court's conclusion about the materiality of the requirement by the city that the Phase 2 bond be replaced.

Third, there is no evidence that plaintiff had a "plan" prior to the LOU to compel the city to falsely require a substitute bond for Phase 2 and to forego enforcement of REDG's Phase 2 bond. Plaintiff did not, and could not, control the

city's actions with respect to application of its development code or enforcement of its permits and bonds. The is no evidence that plaintiff could get the city to do anything.[6]

Fourth, at the time of the LOU, plaintiff's subjective hope about the course of the development—that the city would correctly apply and enforce its land development requirements—was immaterial to defendant's decision to attempt to purchase the property with other investors.[7] Prior to the LOU, defendant extended an offer to purchase the property with other investors with knowledge that plaintiff had earlier attempted the same thing. After termination of the LOU, and with knowledge of plaintiff's intention to seek enforcement of city law and to prepare another offer himself, defendant and other investors made another offer to purchase the property that was successful. Those facts suggest that plaintiff's subjective intentions about his development plans and the city's correct application of city law were irrelevant to defendant's decisions to enter into an investment partnership with various investors, including plaintiff.

Fifth, the trial court's conclusion that plaintiff planned to have the city incorrectly apply its development code to benefit plaintiff to the detriment of defendant is incorrect as a matter of law. There is no evidence that, prior to the LOU, plaintiff planned to have the city do anything that was incorrect. Prior to the LOU, REDG offered to repurchase the property from the bank and planned at that point to succeed to its existing performance agreement and bond. Prior to the LOU, plaintiff anticipated that the city would require the same thing from any new purchaser,

---

[6] *After* termination of the LOU, plaintiff did lobby the city and the bank to require the new owner to obtain a substitute performance bond, as opposed to having the bank, as the existing owner, obtain such a bond and complete the improvements, or the city enforcing the Phase 2 performance bond to benefit the bank or the partnership. Had the bank obtained the bond and completed the improvements, presumably the purchase price would increase at least in the amount of those additional costs, disadvantaging both plaintiff and defendant equally. Indeed, the bank rejected REDG's earlier $2.5 million purchase offer that would have had REDG's performance bond remain in effect.

[7] That same logic applies the other way. Presumably, defendant's subjective hope that the development could be pursued cheaply was immaterial to plaintiff's decision to enter into the LOU. Surely the law of estoppel does not preclude enforcement of a contract when either party fails to disclose their personal intentions prior to the formation of the contract.

including a purchaser who was acquiring the property with REDG. Put another way, plaintiff anticipated that the city would require a performance bond and an additional performance agreement from the partnership to complete the Phase 2 improvements.

That anticipation or "plan" was correct. As noted earlier, the city's development code requires that an applicant/owner of property to be subdivided and improved enter into a performance agreement with the city obligating the owner to improve the property consistently with the performance agreement, and to bond that obligation. EC 9.7025(1)(f); EC 7.145(1). A new owner would similarly be bound, either as a successor-in-interest to the original performance agreement or under a new performance agreement with the city. EC 9.7025(7). In either event, however, the original owner would no longer be obligated to build new improvements as the sole developer of the property, and there would no longer be an insurable interest for the surety to assure unless the performance agreement was amended to substitute the partnership and its members individually. The trial court's implicit finding that this operation of law was instead a matter of city discretion and that, prior to the LOU, plaintiff planned to influence the city to not follow the law is not supported by the evidence or the mandatory requirements of the Eugene Code.

Sixth, the trial court's findings that, at the time of the LOU, plaintiff concealed a true fact that REDG's performance bond could benefit the partnership lacks evidentiary and legal support. In findings 21 and 23, the trial court concluded that the nondisclosure of plaintiff's plans "to have the City release his prior bonds" was material to defendant's decision to enter the LOU. The city does not "release" prior bonds. As noted above, the bonds become "void" when a party to a development agreement has completed the improvements required in that agreement or when there is no longer an insurable interest on the part of the principal to the bond. Both of those conclusions are supported by our holdings in *Stonecrest Properties, LLC*.

That case involved much of the same controversy as the present one. In *Stonecrest Properties, LLC*, Stonecrest (defendant's entity that purchased the subdivision from

the bank) brought an action against the city and DSIC, the surety on the Phase 2 bond, seeking a declaration that the city was obligated to construct the Phase 2 improvements under the bond and performance agreement or otherwise was required to enforce the bond and performance agreement for the benefit of Stonecrest. 280 Or App at 553. We concluded that the city and the surety's obligations under the bond were to be construed consistently with REDG's obligations under the development agreement. *Id.* at 556. We also concluded that Stonecrest was not a third-party beneficiary of the performance agreement and the bond. *Id.* at 556-59.

In evaluating Stonecrest's claim to be a third-party beneficiary of the bond, that is, that the bond directly benefitted Stonecrest, we first concluded the "development agreement was incorporated into the bond and that the two must be construed as one" and that "we view the two documents together." *Id.* at 556. Put another way, the bond, by its terms, insured only REDG's obligation as the subdivider/owner to construct the improvement under its performance agreement. If Stonecrest succeeded to REDG's owner obligations in the performance agreement by assignment, REDG's bond would not insure Stonecrest's obligation because the bond was personal to REDG.[8] Stonecrest would have to obtain its own bond. And the city could choose to enforce the performance agreement's obligation to construct the improvements only against REDG or against Stonecrest if the development rights were assigned to it. As noted, EC 9.7025(7) allows the city to invoke enforcement procedures against "[plaintiff] *or [plaintiff's] successor in interest* [if either party] violates or fails to comply with any of the provisions of the performance agreement or final approved plan."[9] (Emphasis added.)

_____

[8] In *LDS Development, LLC v. City of Eugene*, 280 Or App 611, 614, 382 P3d 576 (2016), *rev den*, 361 Or 100 (2017), a case involving the same record as this case, we held that Stonecrest's successor was not contractually bound by the REDG performance agreement, and could only have liability under that agreement as an assignee. As noted, "Because LDS is neither a party nor an assignee to the development agreement, LDS has no contractual obligation under it." *Id.*

[9] Similarly, if the partnership elected to continue the project without assignment or modification of the development agreement, it would be required, as a developer of a subdivision, to obtain its own performance agreement, public improvement permit, and bond insuring the permitted improvement.

*Stonecrest Properties, LLC* reiterated the conclusion that Stonecrest did not have any contractual interest in the bond as a third-party beneficiary of the bond or the performance agreement. We held that,

> "Stonecrest fails to point to anything in the record that would suggest that the purpose of the development agreement or bond was to confer a 'gift' or some 'right' on any conditional third party. The development agreement expressly disclaims any such intention. *** Similarly, the bond agreement lists only the city as obligee. Although expressly naming a third party as a beneficiary is not required to confer third-party beneficiary status, the failure to do so may serve as 'an indication that the promisee did not intend to confer a right upon it.' *Northwest Airlines v. Crosetti Bros.*, 258 Or 340, 346-47, 483 P2d 70 (1971). The failure to do so here, in conjunction with the development agreement's express disclaimer of any intent to create third-party rights, is decisive."

280 Or App at 557-58.

Thus, I conclude that the trial court's findings, together with any other materiality finding that can be inferred from the evidence, fail to establish that plaintiff made a material nondisclosure about the legal status of the bond or the proposed partnership's obligation to bond its performance of the Phase 2 improvement obligation, and plaintiff's plans to follow the law.

The trial court additionally found that plaintiff defrauded defendant by "materially understating the total costs needed to buy the Property and prepare all of the lots for sale," that this misrepresentation was false, that "[p]laintiff withheld this information from [defendant] to induce [defendant] to enter into the Letter of Understanding with [p]laintiff," and that "[defendant] did so rely by entering into the Letter of Understanding." The trial court entered the following findings in support of its conclusion of material misrepresentation of the cost to complete the project that induced defendant to enter into the LOU with plaintiff:

> "8)   By September 29, 2009, Plaintiff knew that it would cost significantly more than $1,840,000 (at least $1,000,000 more) to purchase the Property back from Umpqua Bank

and do all the work and pay all the bills that would need to be paid in order to prepare all the lots to be sold.

"9)   As of September 29, 2009, [defendant] did not know how much it would cost to purchase the Property back from Umpqua Bank and do all the work and pay all the bills that would need to be paid in order to prepare all the lots to be sold.

"10)   As of September 29, 2009, [defendant] reasonably believed and relied on Plaintiff's representation that the total investment needed to buy the Property and prepare the lots for sale would be $1,840,000.

"* * * * *

"12)   Prior to getting [defendant] to sign the Letter of Understanding between [defendant] and Plaintiff, Plaintiff did not disclose to [defendant] what Plaintiff knew about the true costs of the project, or that it would likely cost at least $1,000,000 more than the $1,840,000 'total investment' stated in the Letter of Understanding.

"13)   The statement in the Letter of Understanding that the 'total investment' would be $1,840,000 was not accurate at the time it was written by Plaintiff, and Plaintiff knew at that time that that was not an accurate statement.

"* * * * *

"16)   The information that Plaintiff knew, and failed to disclose to [defendant], about the true costs to purchase the Property from Umpqua Bank and prepare all the lots for sale, was material to the agreement between [defendant] and Plaintiff, as memorialized by the Letter of Understanding."

On review, plaintiff argues that there is no evidence to support Findings 10 and 16, relating to defendant's justifiable reliance on the "total investment" disclosed costs, and the materiality of that representation. I conclude that there is some evidence to support each finding, and reject that part of plaintiff's third assignment of error.

The majority views both of the determined fraudulent actions, "materially understating the total costs needed to buy the Property and prepare all of the lots for sale" and "concealing from [defendant] [plaintiff's] true plans

regarding securing the City of Eugene's release of his prior bonds and, thereafter, having the City require new performance bonds and guarantees" as "independent grounds" for equitable relief. 302 Or App at 273 (first brackets in original, second brackets added). Plaintiff argues, however, that, "if either of [the] findings is unsupported, the court's ultimate decision must be reconsidered."

I agree with plaintiff that the trial court stated legal conclusions about the grounds for equitable relief that were cumulative, rather than alternative. The conclusions are framed in the conjunctive, and not in the disjunctive. The trial court found fraudulent conduct because of three aspects of "his dealings with [defendant] with regard to the [LOU]:" understating the total costs, concealing his plans regarding the bonds, and using defendant to hide his involvement from the bank. The trial court concluded that (1) plaintiff's representations regarding the costs and the bonds together were knowingly false, (2) defendant was unaware of the true costs and the bond plans, (3) plaintiff withheld both nondisclosures in order to induce defendant to enter into the LOU, and (4) because of those cumulative findings, "[p]laintiff is equitably estopped from prevailing against [defendant] on his breach of contract claim." The trial court also concluded that, "[p]laintiff's [entire] misconduct was sufficiently egregious, serious, and wrongful to warrant denying [p]laintiff relief against [defendant] on [p]laintiff's breach of contract claim under the doctrines of unclean hands and/or in pari delicto."

Accordingly, in my view, the correct disposition of the case is to remand to the trial court to determine whether plaintiff's misrepresentation of the "total investment" stated in the LOU is a sufficient basis by itself to justify equitable relief. In making that disposition, however, it would be helpful to note that there was no misrepresentation at all, much less one that would justify equitable relief.

Findings 12, 13, and 16 determine that the reference to the "total investment" in the LOU was to the total costs to complete the subdivision and that the reference was a material misrepresentation of fact, to which defendant relied to his detriment in entering into the LOU. The

trial court erred in its construction of the meaning of "total investment."

As noted, the LOU provided, in part, that,

"Larry and Mark are responsible for bringing in 50% of the dollars needed to purchase the property from Umpqua Bank including costs associated with Bonding, Erosion Control and City Fees. It is anticipated that the land will be purchased for $1,750,000 and the associated costs will be $90,000 for a *total investment* of $1,840,000.

"Profits will be split 50% to Larry's group and 50% to *Mark's group.* A new LLC will be formed as the purchaser of the property.

"Mark and Larry will be equally responsible for management and decisions made. Larry will focus more on lot sales and any home construction activity and Mark will focus more on the *land development issues*."

(Emphases added.)[10]

We construe the meaning of contracts as instructed by ORS 41.740, the parol evidence rule:

"When the terms of an agreement have been reduced to writing by the parties, it is to be considered as containing all those terms, and therefore there can be, between the parties and their representatives or successors in interest, no evidence of the terms of the agreement, other than the contents of the writing, except where a mistake or imperfection of the writing is put in issue by the pleadings or where the validity of the agreement is the fact in dispute. However this section does not exclude other evidence of the circumstances under which the agreement was made, or to which it relates, as defined in ORS 42.220, or to explain an ambiguity, intrinsic or extrinsic, or to establish illegality or fraud."

ORS 42.220 further explains:

---

[10] Note that the trial court's conclusion that plaintiff made a material non-disclosure in failing to inform defendant that REDG would be accountable for the costs to improve Phase 2 is inconsistent with its conclusion that plaintiff misrepresented the "total investment" by the partnership as *not* including those same costs.

> "In construing an instrument, the circumstances under which it was made, including the situation of the subject and the parties, may be shown so that the judge is placed in the position of those whose language the judge is interpreting."

Accordingly, I review the meaning of "total investment" in the LOU by analysis of the agreement as a whole, being careful not to insert new provisions into the agreement and considering its meaning in light of the circumstances under which the LOU was made.

The meaning of "total investment" is ambiguous. In finding 16, the trial court construed "total investment" to mean the "costs to purchase the Property from Umpqua Bank and prepare all the lots for sale." The four corners of the agreement suggest otherwise. The text of the agreement explicitly states its purpose—to "purchase the property from Umpqua Bank" and to complete the "land development" under the *management* of plaintiff. Thus, the LOU refers to the subdivision as an incomplete "project." The agreement provides that the *financial participation* of "[defendant's] group" and "[plaintiff's] group" (referring to REDG, plaintiff's land development company that was the "original developer of the project"), respectively, is for "50% of the dollars needed to purchase the property" from the bank, together with the "associated costs" of that purchase. "Associated costs" are defined to be "Bonding, Erosion Control and City Fees."[11]

Thus, the LOU explicitly defines the "total investment" to be the sum of the purchase price (anticipated to be $1.75 million)—the "dollars needed to purchase the property from Umpqua Bank"—together with the "associated costs" for bonding, completion of erosion control for Phase 1, and city fees for redoing permits for the new developer—the costs to take over REDG's role as developer of the project. The trial court erred in construing "total investment" to

---

[11] The statement in the LOU that the financial participation of REDG is 50% of the costs of the purchase and the associated costs with that purchase implies, as well, that the financial participation of REDG *does not include* 100% of the development costs under its subdivision approval conditions. The trial court's construction of "total investment" appears to insert this omitted financial obligation of REDG into the trial court's description of REDG's financial participation, contrary to ORS 41.740.

be something else, those specified associated costs together with the costs to construct the improvements to Phase 2.[12]

I also conclude that the trial court's construction of the meaning of "total investment" is inconsistent with the context of the agreement. Defendant testified that he entered into investment contracts, like the LOU, to extend earnest money agreements to purchase property in order to investigate the feasibility of a profitable investment and then to purchase the property if a profit was likely. Defendant made that type of offer to the bank to purchase the subdivision prior to entering discussions with plaintiff on the LOU. It stands to reason that a LOU to form a partnership to make that type of offer to the bank would not disclose or document the result of any cost investigation beforehand.

Because I conclude that the text of the agreement and its context define "total investment" to mean the costs to purchase the property and assume the right to develop the property, and that the estimate of those costs was approximately correct, the trial court erred in concluding that plaintiff misrepresented the sum of the "total investment" in the LOU.

In sum, the trial court erred in finding that plaintiff made a material nondisclosure about the legal status of the bond or the proposed partnership's obligation to bond its performance of the Phase 2 improvement obligation, and plaintiff's plans to follow the law. The proper remedy is to remand for a determination of whether any misrepresentation of the "total investment" was sufficient to justify equitable relief. I dissent from the majority's discussion of the bond nondisclosure and from its disposition of the case.

---

[12] Given the plain meaning of the LOU, further contextual and course of performance evidence is not necessary to interpret its terms. It is, however, worthy to note, that defendant's own description of the consideration necessary to purchase the project included the purchase price, but with "all costs to obtain approval ['for phase 1' to be] the responsibility of the seller." That description was contained not just in defendant's tendered pre-LOU earnest money agreement and in the submitted post-LOU earnest money agreement made on behalf of the partnership; it was also the same as the estimated "total investment" disclosed by plaintiff in the LOU.